STATE

v.

**Marcelino Collazo GOMEZ.**

No. 2002–274–C.A.

Supreme Court of Rhode Island.

May 17, 2004.

Virginia M. McGinn, Providence, for Plaintiff.

Christopher S. Gontarz, Middletown, for Defendant.

Present: WILLIAMS, C.J., FLANDERS, GOLDBERG, FLAHERTY, and SUTTELL, JJ.

## OPINION

SUTTELL, Justice.

"Before you embark on a journey of revenge, dig two graves." [1]

This maxim of venerable wisdom is no less true today than it was during the Chou Dynasty of ancient China. It is a lesson that the defendant Marcelino Collazo Gomez (Gomez or defendant), a young gang member who lived by the code "a bullet for a bullet," will have a lifetime to reflect upon at the Adult Correctional Institutions (ACI). Sadly, the first grave belongs to Jason Gonzalez (Gonzalez), a member of a rival gang.

On the evening of January 9, 1998, Gonzalez was gunned down as he attempted to run away from his assailants in Dunn Park in Woonsocket, Rhode Island. Three shots were fired, two of which struck Gonzalez, the fatal bullet entering the middle of his back and perforating his heart and right lung. He died of massive internal hemorrhage caused by the gunshot wound.

Gomez was tried before a jury on two separate occasions on charges stemming from the incident. At the first trial, in October 1999, he was convicted of conspiracy to commit murder and was sentenced to ten years, six years to serve, at the ACI. The jury, however, was deadlocked on the murder charge, and a mistrial was declared on that count. The second trial, held in June 2001, resulted in his conviction for first-degree murder, for which he received the mandatory life sentence. Gomez appeals from both convictions, raising three issues of alleged error relating to the

---

1. K'ung Fu-tzu (Confucius) circa 551–479 B.C.

first trial and one issue with respect to the second trial. We affirm both convictions.

# I

## Facts and Travel

### A. First Trial

Testimony from the first trial included eleven witnesses and established the events as follows. On that fateful evening, Gonzalez and José Charriez (Charriez), whom Gonzalez had met at a wedding party earlier that day, were walking through Dunn Park on the way to a housing project where Gonzalez intended to get a haircut. Two men approached the pair and asked them, "Quién eres tú?" ("Who are you?"). Neither Gonzalez nor Charriez responded to the question. At trial, Charriez described the men who approached him and Gonzalez in some detail. According to Charriez, both men spoke Spanish, and the taller man was wearing a white shirt with a black stripe and white handwriting. The taller of the two men, defendant Gomez, is six-foot-one-inch tall and weighs 225 pounds. The other man, Christobal Rivera (Rivera), is considerably shorter and wore a dark-colored, hooded sweatshirt, a "hoodie." The jury was able to compare the difference in height between defendant and Rivera when they stood face to face at trial.

Charriez veered off the path while the two men approached, and Gonzalez was cleaning his glasses. After he heard the taller man ask, "Quién eres tú?", Charriez heard a different voice say, "Saca la pistola." "Saca la pistola" means "take out the gun" in English. In response to this prompt, the taller man, who was in front of the other man, pulled a gun out from around his back. Charriez saw the tall man in the white coat extend his right arm, and observed a flash from the gun he held. The tall man fired three shots at Gonzalez.

Although Gonzalez attempted to run away, he was hit twice. One bullet resulted in superficial wounds to his leg. However, the deputy chief medical examiner testified that the other bullet "passed into his chest cavity and lacerated a portion of his right lung * * * perforated through his heart leading to extensive internal hemorrhage * * *." He concluded that the cause of Gonzalez's death was "[m]assive internal hemorrhage due to the gunshot wound of back with perforation of right lung and heart" and that the manner of death was "homicide."

As further testimony educed at the first trial made clear, this was not a random shooting. Rather, it was a deliberate attempt to settle a score between rival gangs. An October 1997 incident provided the impetus. On that occasion, Gonzalez, a member of the gang "27" (gang 27), squared off against Julian Rodriguez, a member of the gang "NETA" (NETA), in a prearranged fight, also in Dunn Park, to settle an argument. During the altercation, Luis Lopez (Lopez), a "counselor" to the president of NETA, intervened in an effort to stop the fight. "Congo," a member of gang 27 and Gonzalez's cousin, shouted "don't get in it," and shot Lopez in the leg. Christobal Rivera took Lopez to the hospital to treat the wound. Both Rivera and Lopez were questioned about the shooting, but neither told the police that it involved a fight between members of gang 27 and NETA. When questioned by Det. Shawn Kerrigan of the Woonsocket Police Department, Lopez said that he was shot while trying to break up a fight between two men that he did not know.

After the October shooting, NETA had several meetings in which the gang discussed revenge for the injuries to Lopez. During those meetings, the gang members

decided that they would return a "bullet for a bullet" and that Congo would be killed or taken care of. Gomez attended these meetings, one of which took place at his house. Rivera and Gomez lived in the same housing complex. Rivera testified that he never saw defendant with a gun before the murder, but that he saw a box of bullets for a .380–caliber automatic weapon on top of the refrigerator in Gomez's kitchen. The murder weapon used in the shooting on January 9, 1998, never was found, but a detective from the Woonsocket Police Bureau of Criminal Identification testified that he found a bullet and three shell casings at the scene of the crime and that the ammunition was .380–caliber. Furthermore, an expert from the University of Rhode Island Crime Laboratory testified that the three shell casings were all fired from the same .380–caliber automatic weapon.

Rivera also testified that on the evening of January 9, 1998, he was returning to a girlfriend's house when he received a page from Gomez. Rivera returned the call, and Gomez said he thought he had seen Congo. Gomez asked him to go with him "to the circle," a cul-de-sac in Dunn Park, to look for Congo. Gomez joined Rivera, and the two proceeded to the circle at Dunn Park. When the two men reached the park, Rivera stayed ten feet behind Gomez and asked Gomez what he was going to do, to which Gomez told Rivera to be quiet. Rivera testified that he was still ten feet behind Gomez when a person came toward them. Gomez asked the person who he was, and when the person did not respond, Gomez said, "I have a gun. I'm going to draw it." Rivera then heard a shot, started to run, and heard two more.

Rivera's older sister, Emily Rivera, testified that she was at defendant's girlfriend's house the night of the murder. Late that night, "Junior," as Gomez was known, arrived and "said that he had shot twice somebody." He also was "acting a little desperate" and threatened that "whoever said something he would kill." She said that defendant's conduct and comments made her feel "afraid. More than afraid." Christobal Rivera also testified that defendant threatened to kill him and his family if he said anything to the police about the murder. Emily Rivera then got a call from her brother telling her to come to his girlfriend's house. When she got there, Christobal Rivera was sitting on the sofa crying, and told her that "he had not done it and that Junior had killed him [Gonzalez]."

Emily Rivera also testified that defendant was wearing a white Chicago Bulls jacket that night. "It had a bull in the back, red one, and one in the front, a small one, and it said something like that. It said something like Chicago, if I'm not mistaken." She identified the jacket in court and also testified that Gomez gave the jacket away after the murder. This testimony was corroborated by Kaylene Maleve, who testified that Gomez, who was dating her sister, gave her the white Chicago Bulls jacket. For his part, Gomez later testified that he gave the coat away because he did not want to remember the events of that day.

Emily Rivera further testified that she was friendly with defendant's mother, Vilma, and had lived with Vilma's family, including defendant, for a time in December 1997, a few weeks before the murder. When she was living with defendant's family, she saw defendant with a gun in the kitchen of the home. After Vilma Gomez commanded defendant to get the gun out of her house, defendant tucked the gun into his pants and left.

In the first trial, Gomez testified in his own defense. He explained that he became a member of NETA through his

acquaintance with Christobal Rivera. He admitted that he was NETA's treasurer and secretary. He testified that at NETA meetings the members discussed getting revenge for the October shooting of Luis Lopez, but that Lopez did not want to do it, but "Christobal was always talking he wanted to shoot back." Gomez further asserted that he never volunteered to shoot Congo or Jason Gonzalez. He also denied owning or possessing a gun, but alleged that Rivera had one.

He said that on January 9, 1998, he was at Johan Rodriguez's house when Rivera knocked on the door. Rivera told him that "Congo and Jason were coming down," and that he should go with Rivera because he "was going to fight them. I [Rivera] want you to watch to make sure that the other one doesn't jump in." Gomez told Rivera "that was fine," and went with him to the park in his Chicago Bulls coat.

Gomez testified that Rivera took off running to the park, despite Rivera's asthma, and when they got to the park he saw two people coming at them. He said that he could not tell who those people were, so he asked, "Quién eres tú?" No one answered. Gomez later testified that he had seen both Jason Gonzalez and Congo before, and that they had different builds. He further testified that, to his surprise, Rivera took out a gun. Gomez asked Rivera what he was going to do with the gun. At that point, he said he heard a shot and started running. While he was running, he heard the second shot, but not the third. He also testified that he saw Rivera at an apartment five or ten minutes after the incident, and told him "don't talk to me about anything." He said that he would not have gone to the park that evening had he known that Rivera had a gun.

On January 11, two days after the shooting, Gomez went to New York. He flew to Puerto Rico on January 14. When asked why he went to Puerto Rico, he testified that "[m]y mother was already in Puerto Rico and I had plans to go on vacation." He later testified that he had expected his mother to come back from Puerto Rico in the first week of January. When asked why he went there after she was scheduled to come back, Gomez replied that he was visiting other relatives in Puerto Rico. While in Puerto Rico, Gomez's mother learned that Christobal Rivera had turned himself in and had blamed Gomez for the murder. However, Gomez also testified that it took a week or a week and a half before his mother found him at a female friend's house in Puerto Rico to deliver the news. As a result, Gomez surrendered himself in Puerto Rico on February 9, 1998.

The first trial resulted in a mistrial on the murder count and a conviction on the conspiracy count. The trial justice also denied defendant's motion for a new trial because he could not say as a matter of law that the jury was clearly wrong to have found that the evidence supported a conspiracy conviction beyond a reasonable doubt. Noting his instruction to the jury on conspiracy, he commented:

"I told the jury that the crime was complete when the agreement is reached. The jury could have easily found the agreement was reached in those meetings when he said 'a bullet for a bullet.' I might have come to a different verdict."

On appeal, Gomez asserts that the trial justice erred in denying his motion for a new trial. He also challenges an evidentiary ruling that precluded him from impeaching Rivera, "the state's star witness," by exploring the underlying circumstances of Rivera's prior criminal convictions. Finally, he argues that the trial justice erred by instructing the jurors that they could infer a consciousness of guilt if they found

as a fact that defendant fled the jurisdiction "because of the crime and not for any other reason."

## B. Second Trial

The second trial produced many of the same witnesses giving substantially the same testimony as they did in the first trial. A notable addition in the second trial was the testimony of Julian Rodriguez (Rodriguez). Rodriguez, a NETA member until its breakup in 1999, testified that Christobal Rivera founded the Woonsocket chapter of NETA and recruited him as a member. He further testified that the fight on October 7, 1997, resulted from an earlier argument between a gang–27 member, Pablo Diaz, and a NETA member, Saul. Rodriguez testified that it was his duty as a member of NETA to support his fellow gang member "[b]ecause that's how we are, one of our brothers is in trouble, we got to be there for them." Rodriguez intervened in the argument to support Saul. The two contingents separated and, on the counsel of Luis Lopez, NETA's advisor and victim of the shooting on October 7, 1997, Rodriguez was chosen to fight against a gang–27 member, Jason Gonzalez.

Rodriguez knew Gonzalez from Puerto Rico and was on seemingly friendly terms with him. However, he and two other NETAs, including Rivera, had to fight Gonzalez and two other gang–27 members, as gang policy dictated. He testified that the combatants were to obey certain ground rules. For instance, there were to be no weapons, and "[i]f the person falls, let him get up, things like that." Rodriguez squared off against Jason Gonzalez, and when Rodriguez got the upper hand, he heard a voice say, "[g]et off my cousin." When Rodriguez looked up, there was a gun in his face.

He explained that after he heard the voice say "get off my cousin," he heard a gunshot. He could not see the gun fired because there was a shadow in front of him, but he did see Lopez step in front of him and take the bullet in his leg. Rodriguez and Gonzalez helped each other up, and then Rodriguez helped Lopez to get up. Congo, Gonzalez's cousin, was still firing, and Lopez pulled out a gun and attempted to fire back. Lopez's gun jammed when he attempted to return fire. It is unclear how the incident resolved itself, but Gonzalez ultimately left with Congo. Rodriguez helped take the wounded Lopez to the hospital.

Rodriguez's further testimony established that NETA members had at least six or seven guns at the time. On many occasions in Gomez's house, Rodriguez had seen the .380–caliber automatic handgun that Lopez attempted to fire. However, Rodriguez denied that Gomez was a member of NETA, despite NETA's efforts to recruit him. Moreover, he testified that when he had seen the gun at Gomez's house it was in Rivera's hands. He further testified that he attended many meetings at which NETA members were present, and they discussed the Lopez shooting. At those meetings, they decided that they were going to "get" Congo, that "[w]e were going to kill him." But NETA had no plans to go after Jason Gonzalez.

Rodriguez testified that all NETAs had the responsibility to get Congo. Gomez was present at some of the meetings when NETA members talked about getting Congo. Rodriguez said that the agreement to get Congo was called a "150" and that "when the NETAs are looking for somebody * * * we call it a 150, which any member that if he sees that person, has to either, if you got a gun, kill him; if you see him, beef with him or bring him back to

the association." Rodriguez testified that the "150" was put out on Congo and Raffie, Gonzalez's brother-in-law, but not on Gonzalez himself. According to Rodriguez, Congo was the person with the gun and Raffie was the person who said to shoot, but Gonzalez was just fighting man-to-man.

Rodriguez first learned that Gonzalez had been shot when the police knocked on his door at 4 a.m., the morning after the murder. He said that when he found out he was mad at "[e]verybody, the police, the NETAS, everybody" because the wrong person had been shot. He testified that he did not then know who had killed Gonzalez.

Rodriguez said that he had a conversation with Gomez the Saturday after the shooting on January 9, 1998. He testified that he "asked him [Gomez] if [Gomez] and Christobal were the ones that did it." To this question, Gomez replied, "[n]ope." He said that the conversation took place in Gomez's car, and that Rivera was present. Rodriguez then recounted the rest of the conversation that took place in defendant's car. On direct examination, he said that he told Gomez that he knew that Gomez did it, that he had shot Jason Gonzalez. This time Gomez did not respond, but "just turned his head."

At this point, the trial justice was confused about whom in the car Rodriguez was talking to. The trial justice asked, "talking about Marcelino Gomez?" When asked who he had addressed his earlier question to Marcelino Gomez, Rodriguez replied, "Christobal told me that you guys were the ones who did it." At that point defendant's counsel objected and moved to strike. After some discussion, the trial justice overruled the objection, ruling that Gomez's unresponsiveness to Rodriguez's direct question constituted an adoptive admission.

When asked again what he said to Gomez during their ride in Gomez's car, Rodriguez said:

"Yeah. Well, we asked Christobal. First he said that they didn't do it. We asked him again and he was like, 'Yeah, we did it.' And I asked him, 'We, what do you mean, we?' He goes, 'Me and Marcelino did it.' And we went and picked up Marcelino on the way back. I asked him, 'Did you guys do it?' He didn't say nothing. Then I looked, I said, 'Christobal told me you did it,' and there was no answer."

The prosecution reiterated, "Just to be clear. You're in the car, you asked him, 'Christobal told me that you guys did it together.' You had no response to that." Rodriguez answered that Gomez did not reply to this accusation.

Finally, Rodriguez testified that he, Luis Lopez, and Lopez's mistress drove Gomez from Rhode Island to New York a few days after the shooting to get him on a plane to Puerto Rico. Gomez was going to Puerto Rico "[b]ecause he didn't have no family members here at the time and he was being charged with something he said he didn't do and he wanted to go to his family." On hearing this testimony, the following exchange took place:

"[State]: You helped him flee the jurisdiction; correct?

"[Rodriguez]: Yup.

" * * *

"[State]: NETAS got together and they gave this Defendant, Marcelino Gomez, the money to fly to Puerto Rico?

"[Rodriguez]: Yup.

"[State]: Within days of the shooting?

"[Rodriguez]: Yeah.

"[State]: And he was leaving because he knew he was about to be charged with murder; correct?

"[Rodriguez]: Yeah."

Rodriguez's subsequent testimony reiterated that NETA money and its members assisted Gomez in fleeing the jurisdiction despite his insistence that he did not shoot Jason Gonzalez.

The state called Emily Rivera again. She testified in accordance with her testimony at the first trial. She recounted that she saw Gomez with a gun in the Gomez home "around December," when she stayed with them. She also recounted the events of the night of January 9, 1998, when she was staying with Gomez's girlfriend, Johan Rodriguez. She recounted that she was at the house when Gomez arrived. She testified that he was wearing the white coat, which she again identified. She said that he was acting "desperate" and that he said that "he had shot someone twice." She again told how "[i]f we said anything about it that we—he was going to kill us." She again testified that defendant's behavior made her afraid and that when she saw Christobal Rivera later that night, he was sitting on his girlfriend's couch and crying.

Furthermore, counsel for the state and defendant entered a stipulation in which they agreed that all the shell casings and bullets retrieved from the scene were fired from the same gun. The state and defense entered an additional stipulation concerning Argentina Martinez, an unavailable witness. They agreed that had Martinez testified, she would have said that she was the owner of Ultissimo Beauty Salon on Cranston Street in Providence, and that she hired Gomez to work in her salon as a barber. He worked at Martinez's salon for about a month. One day he did not show up for work, and she has not seen him since. Gomez never asked her for a vacation and never told her he was going to Puerto Rico. Around that time, Gomez's mother called Martinez to tell her that defendant was sick in the hospital and would not be able to go to work. In addition, Gomez did not take the stand in the second trial, but his testimony from the first trial was read into the record by the state.

On June 13, 2001, the jury returned a verdict of guilty on the first-degree murder count. The defendant's counsel filed a motion for a new trial, which was heard and denied on June 29, 2001. The trial justice imposed the mandatory life sentence at the same hearing. The defendant timely appealed. The appeals from both the first and second trials have been consolidated.

## II

### Discussion

The defendant raises four issues on appeal. He contends that the first trial justice erred by giving an erroneous flight instruction, by precluding inquiry into Christobal Rivera's previous convictions, and by denying the motion for a new trial after the first trial, and that the second trial justice erred by allowing an adoptive admission to be admitted against him in the second trial. We will address each issue below. Additional facts will be recited where appropriate.

### A. The Flight Instruction

■ First, Gomez argues that the trial justice in the first trial erred by giving the jury a so-called flight instruction, and then by doing so improperly in light of the chain of inferences set forth in *State v. Cooke*, 479 A.2d 727 (R.I.1984).

■ "It is settled practice in this state that relevant evidence of flight may be introduced as a circumstance bearing on the question of guilt that may be presented to the jury for consideration." *Cooke*, 479 A.2d at 732 (citing *In re Caldarone*, 115 R.I. 316, 326, 345 A.2d 871,

876 (1975)). In *Cooke,* 479 A.2d at 732–33, we adopted the four-link chain of inferences concerning the relevance of flight as evidence of a defendant's guilt from *United States v. Myers,* 550 F.2d 1036, 1049 (5th Cir.1977).

"The relevanc[e] of flight as evidence of a defendant's guilt, however, depends on the degree of confidence with which a chain of inferences can be followed: (first inference) something the defendant did led him to flee, (second inference) he fled out of consciousness of guilt, (third inference) his consciousness of guilt derived from consciousness of guilt concerning the crime charged, and (fourth inference) his consciousness of guilt concerning a crime charged reflects actual guilt of the crime charged." *Cooke,* 479 A.2d at 732–33.

We also noted that the third and fourth inferences are the most difficult to establish so we place "great reliance on the proximity in time of the flight to the crime charged in order to establish these inferences." *Id.* (quoting *United States v. Howze,* 668 F.2d 322, 324–25 (7th Cir. 1982)). "However, for a flight instruction to be valid, it need not cover or explicitly articulate each link in the chain of inferences detailed in *Cooke.*" *State v. Perry,* 725 A.2d 264, 267 (R.I.1999).

To support his argument, defendant challenges the second inference from *Cooke,* 479 A.2d at 732, that defendant fled out of consciousness of guilt. He contends that the uncontradicted evidence is that he left the State of Rhode Island on January 11, 1998, the day *before* Rivera talked to the police, and the day *before* a warrant was issued for Gomez's arrest, thus negating any inference that he had left the state because of any consciousness of guilt.

The defendant argues that numerous facts militate against an inference that he fled out of a consciousness of guilt. The

day after the shooting, Christobal Rivera drove him to work. He went along with his normal, busy life. He traveled to New York and then Puerto Rico under his own name. He turned himself into the authorities in Puerto Rico when he heard about the charges pending against him.

We are satisfied, however, that the record also contains ample evidence to support the inference. Immediately after the shooting, defendant did not remain at the scene to assist the victim or tell the police what had happened. Instead, defendant acknowledges that he accompanied Rivera with the expectation of confronting Congo, and then when the shooting occurred "I [Gomez] just started running quickly." Emily Rivera testified that defendant said he had shot somebody twice, was acting a little desperate, and threatened to kill anyone who said something about his involvement. The defendant gave away the white coat that he was seen wearing by two witnesses on the night of the shooting. Two days after the shooting, he uncharacteristically failed to show up for work without notifying his employer, and went to New York intending to take a flight to Puerto Rico. He bought a one-way ticket and did not know how long he was going to stay. He went ostensibly to see his mother, but she was scheduled to return shortly. Then, once in Puerto Rico, he didn't attempt to visit her; rather, it took her a week and a half to find him. The trial justice considered *all* of these facts and was not persuaded by defendant's argument.

Nor do we detect any error in the trial justice's decision to give the jury a flight instruction. "A reasonable jury could infer consciousness of guilt from such evidence." *State v. Correia,* 707 A.2d 1245, 1249 (R.I.1998). Gomez could have fled Dunn Park after the shooting out of consciousness of guilt, fear of being caught in

a gunfight, fear of being mistaken for the shooter, or just out of excitement and confusion. Furthermore, Gomez could have left Rhode Island and gone to Puerto Rico because he was following through on previous plans to take a vacation, or because he wanted to get as far away from the reach of law enforcement as possible. The point was not for the trial justice to speculate about the reasons for Gomez's actions, but for the jury to determine those reasons after hearing the evidence. *See Cooke*, 479 A.2d at 733 (weight given to flight evidence should be left to jury's discretion). From the totality of the evidence introduced at this trial, the trial justice properly instructed the jurors that they could infer consciousness of guilt based upon Gomez's actions in fleeing the scene of the shooting. The flight instruction merely asks the jurors to consider whether defendant undertook certain actions with a consciousness of guilt; the instruction does not require that they infer a consciousness of guilt from the flight alone. We will address the substance of the flight instruction below.

That the arrest warrant for Gomez was not issued until after he left Rhode Island is merely tangential to his consciousness of guilt. When analyzing consciousness of guilt, an arrest warrant for the crime is only a formal manifestation. We held in *Cooke*, 479 A.2d at 733, that "the linchpin of flight as probative of guilt is a defendant's knowledge of the reason why he is fleeing and that the reason he is fleeing is related to the crime on trial." What is more important for our analysis is that Gomez was aware that the crime occurred, and that he fled from the scene regardless of whether a warrant was issued. Therefore, the date that the arrest warrant for Gomez was issued is immaterial and irrelevant to the trial justice's decision to instruct the jury on defendant's consciousness of guilt.

■ Finally, we conclude that the flight instruction by the first trial justice, although perhaps not an exemplar of clarity, adequately apprised the jury of the law pertaining to flight. "We have regularly held that we shall affirm a trial justice's jury instructions when, examined in their entirety from the perspective of a jury of ordinary intelligent lay people, the instructions adequately cover the law and neither reduce nor shift the state's burden of proof." *State v. Keiser*, 796 A.2d 471, 472 (R.I.2002) (mem.).

The trial justice instructed the jury as follows:

"Now there's a concept of law about if you find there was flight how you can use it. You can use it by drawing reasonable inferences and the inferences are that something the defendant did caused him to flee out of consciousness of guilt and guilt arrived from the crime charged reflecting an actual guilt of the crime charged if you find as a fact that he did flee because of the crime and not for any other reason."

The jury was instructed to draw the inference that defendant's flight from the scene of the shooting and subsequent flight from Rhode Island and the United States was prompted by his consciousness of guilt from the crime.

The defendant maintains that the flight instruction was flawed because it did not explicitly follow the four inferences from *Cooke*. As we have previously stated, however, "for a flight instruction to be valid, it need not cover or explicitly articulate each link in the chain of inferences detailed in *Cooke*." *Perry*, 725 A.2d at 267. Although, the trial justice did not explicitly recite the four *Cooke* inferences, his instruction was adequate to apprise the jury members that they could draw an inference of guilt out of the fact that Gomez fled from the scene of the shooting and subsequently from Rhode Island.

The instruction clearly apprised the jurors that, to draw an inference of guilt, they first must find as a fact that Gomez fled because of the crime and not for any other reason. It also informed them that they could draw reasonable inferences from his flight. More specifically, they could infer that what defendant did caused him to flee out of consciousness of guilt of the crime charged. We reiterate our admonition in *Cooke*, 479 A.2d at 733: "instructions dealing with flight should take into consideration the four inferences * * *." Here, however, we discern no error.

## B. Impeachment

Gomez next argues that at the first trial the trial justice erred in denying him the opportunity to inquire into the underlying circumstances of Christobal Rivera's previous convictions for impeachment purposes. The defendant posits that he should have been allowed to explore the specific facts of Rivera's previous convictions to show "that Christobal Rivera acted in conformity with his prior violent, aggressive acts," which, Gomez contends, is an essential element to his defense. The defendant cites Rules 404(a)(2) and 405(b) of the Rhode Island Rules of Evidence[2] as authority to "allow a defendant to use specific violent acts as proof of violent character." The trial justice should have exercised his discretion and permitted him to make the inquiry, he maintains, "and then cautioned the jury that such evidence is only to be considered with regard to the witness'[s] propensity for violence."

"It is well settled that this Court will not disturb a trial justice's ruling on an evidentiary issue unless that ruling 'constitutes an abuse of the justice's discretion that prejudices the complaining party.'" *State v. Dellay*, 687 A.2d 435, 439 (R.I.1996) (quoting *State v. Johnson*, 667 A.2d 523, 530 (R.I.1995)). Here, we conclude that the trial justice properly found that Rivera's previous convictions were admissible for impeachment purposes during cross-examination, but that the underlying facts of those convictions were not admissible.

Before defendant's cross-examination of Rivera, the trial justice heard defendant's arguments that the facts involved in Rivera's prior convictions should be allowed into evidence. Gomez maintained that he should be entitled to "try to paint a differ-

---

2. Rule 404(a) of the Rhode Island Rules of Evidence provides in part:

"**Character evidence not admissible to prove conduct; exceptions; other crimes.—** (a) *Character Evidence Generally.* Evidence of a person's character or a trait of the person's character is not admissible for the purpose of proving that he or she acted in conformity therewith on a particular occasion, except:
"* * *
"(2) *Character of Victim.* In cases in which the defendant has raised self-defense, evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution to rebut evidence that the victim was the first aggressor[.]"

Rule 405 of the Rhode Island Rules of Evidence provides:

"**Methods of proving character.—**(a) *Reputation or Opinion.* In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.
(b) *Specific Instances of Conduct.* In cases in which character or a trait [of] character of a person is an essential element of a charge, claim, or defense, or when evidence is offered under Rule 404(b), proof may also be made of specific instances of the person's conduct."

ent picture of this particular [witness]," the only witness that places a gun in Gomez's hand, "than the state would have the jury believe." Further, he argued that the proximity in time of the previous convictions to Gonzalez's murder weighed in favor of admitting such character evidence. According to Gomez, in November 1997 Rivera was convicted of "bashing out the window of his girlfriend with a baseball bat," and in December he attempted "to strangle his girlfriend with a telephone cord."

In denying the defendant's request, the trial justice explained:

"Relevant evidence is that evidence which would be an aid to the jury in addressing issues that confront them. The issues that confront this jury is that Mr. Gomez is charged with first degree murder. What Mr. Rivera might have done in the past I feel has no bearing on the issue before this jury and that is whether the defendant was guilty of first degree murder. I find that obviously impeaching—you can impeach by a criminal record but I know of no rule of law that allows you to go after that impeachment into the circumstances surrounding that activity that caused the criminal record. Therefore, I'm going to limit you, [defendant's counsel]. You can go into the criminal record and that is all."

The defendant's counsel was allowed to establish that Rivera had prior convictions for malicious damage to property and domestic assault, for which he received a one-year sentence with three months to serve, and second-degree murder and conspiracy to commit murder in the death of Jason Gonzalez.

The defendant's reliance on Rules 404(a)(2) and 405(b) to support his arguments on appeal is misplaced. Rule 404(a)(2) deals with the admissibility of character trait evidence of victims "[i]n cases in which the defendant has raised self-defense." The defendant did not raise self-defense, but merely wanted to introduce evidence of Rivera's propensity for violence to cast doubt on whether defendant was the shooter. Rule 405(b) deals with methods of proving character when "character of a person is an essential element of a charge, claim, or defense." As the trial justice correctly noted, Rivera's previous conduct was not in the least relevant to the murder charge against Gomez, much less "an essential element of a charge, claim, or defense." Moreover, Rule 404(a) provides that "[e]vidence of a person's character or a trait of the person's character is not admissible for the purpose of proving that he or she acted in conformity therewith on a particular occasion."

Even Rule 404(a)(3), which allows for the admission of character evidence of a witness "as provided in rules 607, 608, and 609," is unavailing to defendant. Rule 607 of the Rhode Island Rules of Evidence merely provides for "[w]ho may impeach" a witness. Subsections (a) and (b) of Rule 608 of the Rhode Island Rules of Evidence allow the credibility of a witness to be attacked by opinion and reputation evidence or specific instances of conduct. However, Rule 608(b) is unavailing as well because that rule allows evidence of specific instances of conduct "(1) concerning the witness'[s] character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness." None of Rivera's previous convictions went to his character for truthfulness. Furthermore, defendant's argument is not predicated on Rivera's propensity to lie, but his propensity for violence.

Rule 609(a) of the Rhode Island Rules of Evidence allows evidence of prior convic-

tions to be admitted "[f]or the purpose of attacking the credibility of a witness * * *." The trial justice did admit evidence of Rivera's prior convictions for impeachment purposes. However, he limited the inquiry to the crimes and sentences constituting those convictions because none of these convictions dealt with crimes concerning the witness's character for truthfulness. *See* Rule 608(b)(1). Rather than conduct a minitrial to·prove the details of the crimes for which Rivera was convicted, the trial justice properly let the convictions speak for themselves.

### C. Motion for a New Trial

◼ The defendant next argues that his motion for a new trial at the conclusion of the first trial should have been granted. The defendant filed a timely motion for a new trial pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure. That motion was heard and denied on November 8, 1999. The defendant concedes that the trial justice properly articulated the facts that led to the jury's decision, but he argues that the motion should have been granted in the "interest of justice" because the trial justice added, "I might have come to a different verdict" and "I differ from the jury but I can't say they are wrong."

◼ The standard when ruling on a motion for a new trial is well established in Rhode Island. "In deciding a motion for a new trial, the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." *State v. Otero,* 788 A.2d 469, 472 (R.I.2002) (quoting *State v. Banach,* 648 A.2d 1363, 1367 (R.I.1994)). "If, after conducting this independent review, the trial justice agrees with the jury's verdict or if the evidence is such that reasonable minds could differ as to the outcome, the motion

for a new trial should be denied." *Id.* (citing *State v. Marini,* 638 A.2d 507, 515–16 (R.I.1994)). "If, however, 'the trial justice finds that the state has failed to sustain its burden of proof, a new trial must be ordered.'" *Id.* (quoting *State v. Clark,* 603 A.2d 1094, 1096 (R.I.1992)).

· ◼ In ruling on a motion for a new trial, "the trial justice need not refer to all the evidence supporting the decision but need only cite evidence sufficient to allow this court to discerri whether the justice has applied the appropriate standards." *Otero,* 788 A.2d at 472 (quoting *Banach,* 648 A.2d at 1367). If the trial justice has complied with this procedure and articulated adequate reasons for denying the motion, his or her decision will be given great weight and left undisturbed unless the trial justice overlooked or misconceived material evidence or otherwise was clearly wrong. *Id.*

In this case, the trial justice followed the proper procedure. He recited the proper standard of review.

> "On a motion for the new trial I must view the evidence and weigh the credibility of the witnesses and exercise my independent judgment. If I find reasonable people could not have found the defendant guilty, then I must grant the motion. If I find reasonable persons could differ, I must deny the motion."

Next, the trial justice considered pivotal facts that led to the jury's decision. He noted that although he questioned Christobal Rivera's motives in his testimony, "obviously the jury believed him" and that he could not say of "the evidence in this case that reasonable men could not have found the verdict which they did." In commenting on the evidence, he remarked that reasonable minds could differ on the verdict, as he "was quite surprised they didn't find the defendant guilty of murder * * *." We are well satisfied that the

trial justice correctly applied the standard for a new trial.

Moreover, with regard to the conspiracy conviction, the trial justice pointed out that the conspiracy could have been formed on multiple occasions. The trial justice weighed the conspiracy evidence as follows:

"[T]he witness heard, 'Take out the gun' from a different voice than 'who are you?' The jury could have easily thought that was the agreement or the agreement was made months before and carried out on the day of the shooting.

"I told the jury that the crime was complete when the agreement is reached. The jury could have easily found the agreement was reached in those meetings when he said 'a bullet for a bullet.' I might have come to a different verdict.

"I cannot state as a matter of law that the jury is clearly wrong, as reasonable men could differ, and I differ from the jury, but I can't say they are wrong. So, therefore, I must deny the motion."

Once again, the trial justice recited the facts and pointed out that reasonable minds could disagree about when and if the conspiracy was formed. Although the trial justice may have come to a different verdict had he been on the jury, that difference merely reinforces that he applied the correct standard. He explained that reasonable minds could disagree on the above facts; hence, the conviction for conspiracy was warranted.

### D. The Adoptive Admission

■ The defendant's final issue on appeal concerns Julian Rodriguez's testimony from the second trial. The defendant objected to Rodriguez's account of a conversation he had with defendant about the Gonzalez murder. Rodriguez testified that he asked defendant whether he and Christobal Rivera were the ones who had shot Jason Gonzalez. During the same conversation, Rodriguez pressed the issue and defendant was silent. The relevant testimony went as follows:

"[State]: Did you ever have a conversation with this Defendant, Marcelino Gomez, about the shooting of Jason Gonzalez?

"[Rodriguez]: Yeah, I asked him about it.

"[State]: What did you say to him?

"[Rodriguez]: I asked him if him and Christobal were the ones that did it.

"[State]: What did he say to you?

"[Rodriguez]: Nope."

When this conversation took place, Rodriguez, defendant, and Christobal Rivera were in defendant's car driving from Providence to Woonsocket. The conversation continued:

"[State]: You asked Christobal first who did it; correct?

"[Rodriguez]: Yup.

"[State]: He gave you an answer; correct?

"[Rodriguez]: Not at first.

"[State]: Did he eventually, without telling me what the answer was, did he eventually give you an answer?

"[Rodriguez]: Yeah.

"[State]: Based on information, did you ask Marcelino Gomez any questions?

"[Rodriguez]: Yeah.

"[State]: What did you ask him exactly?

"[Rodriguez]: I asked him if they were the ones that did it.

"[State]: Is that what you said, 'Are you the ones that did it?'

"[Rodriguez]: Yup.

"[State]: Did you tell him that Christobal had told you who did it?

"[Rodriguez]: About the second time I asked him, yeah.

"[State]: Did you tell him that you had information that he did it?

"[Rodriguez]: Yeah.

"[State]: When you told him that you knew that he did it, what did he say?

"[Rodriguez]: He didn't say nothing, just turned his head.

"[State]: Didn't say anything?

"[Rodriguez]: No."

To this point in the testimony, defendant's counsel had not objected. It was not until the prosecution clarified, on the trial justice's prompting, that defendant's counsel objected.

The trial justice asked the witness whether he was talking to Marcelino Gomez. The prosecution then asked, "You told Marcelino Gomez?" Rodriguez responded, "Christobal told me that you guys were the ones who did it and you did it." At that point, defendant's counsel objected and moved to strike. At a side-bar conference, defendant's counsel objected on the grounds that the statement was hearsay. The trial justice agreed that there was some hearsay in what Christobal Rivera told Rodriguez, but that the questions put to Gomez made his failure to respond an adoptive admission. The trial justice overruled the objection.

■ Rule 801(d)(2)(B) of the Rhode Island Rules of Evidence provides that a statement is not hearsay if it is "a statement of which the party has manifested his or her adoption or belief in its truth." A party may adopt a statement by means of conduct: "The adoption may be express * * * or silent, if the party reasonably could be expected to protest a statement made in his presence if he believed it was untrue." Advisory Committee's Note to Federal Rule of Evidence 801(d)(2)(B) (reprinted in Rhode Island Rules of Evi-

dence, Rule 801, Advisory Committee's Note). Our decisions have echoed this rationale for allowing adoptive admissions.

"Where a statement is made within the presence and hearing of an accused which is incriminatory or accusatory in character and such statement is not denied by him, the statement and the fact of his failure to deny are admissible as an admission of the statement's truth." State v. Lerner, 112 R.I. 62, 83–84, 308 A.2d 324, 338 (1973) (citing State v. Reitsma, 68 R.I. 310, 316, 27 A.2d 312, 315 (1942)).

■ In Lerner, 112 R.I. at 84, 308 A.2d at 338, we announced five criteria that a trial justice should consider when ruling on the admissibility of incriminating statements made within hearing of an accused when the statement is not denied. The criteria are:

"(1) the statement was incriminating or accusatory; (2) that it was one to which an innocent person in the situation of the defendant would reply; (3) that it was made within the presence and hearing of the defendant; (4) that he understood the meaning of the statement; and (5) that he had an opportunity to deny or reply to the statement." Id.

These criteria have been reinforced through subsequent decisions of this Court. State v. Lambert, 705 A.2d 957, 962–63 (R.I.1997) (explaining rule and reciting criteria from Lerner); State v. Lussier, 686 A.2d 79, 81 (R.I.1996) (per curiam) (distinguishing mere silence from remark to which one would expect a reply); State v. Pacheco, 481 A.2d 1009, 1014–15 (R.I.1984) (explaining rule and reciting criteria).

The trial justice overruled defendant's objection to Rodriguez's statement, "Christobal told me that you guys were the ones who did it and you did it." The defen-

dant's counsel objected to the question on the grounds that the statement was hearsay. The trial justice explained that the statement and lack of response qualified under the adoptive admission exception to the hearsay rule because "[t]his is something, as I understand it, this witness addressed to your client, the Defendant." After defendant's objection was overruled, Rodriguez once again testified about the conversation in defendant's car after the murder.

"Yeah. Well, we asked Christobal. First he said that they didn't do it. We asked him again and he was like, 'Yeah, we did it.' And I asked him, 'We, what do you mean, we?' He goes, 'Me and Marcelino did it.' And we went and picked up Marcelino on the way back. I asked him, 'Did you guys do it?' He didn't say nothing. Then I looked, I said, 'Christobal told me you did it,' and there was no answer."

The defendant did not renew his objection at this point.

The defendant's earlier objection to Rodriguez's statement at trial was that the statement was hearsay. On appeal, defendant argues that the statement did not qualify as an adoptive admission because "there was never any inquiry made as to whether [defendant] heard the statement from Rodriguez, understood what was said, and whether or not he had the opportunity to deny or reply to the statement." Because no inquiry was made into whether these criteria were met, defendant concludes, "[The defendant's] silence was just as indicative of something else as it was of consciousness of guilt."

■ We give considerable latitude to a trial justice's rulings made during examination of witnesses at trial. *State v. Boillard*, 789 A.2d 881, 886 (R.I.2002). We overturn such rulings "only when there has been an abuse of discretion or substan-tial injury to a defendant." *Id.* (citing *State v. Girouard*, 561 A.2d 882, 888 (R.I. 1989)). As an initial matter, we note that Rodriguez's statement that "Christobal told me that you guys were the ones who did it and you did it," standing alone, would have been inadmissible hearsay. Rule 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Had this statement been admitted to prove the truth of the matter asserted, namely that Gomez and Rivera shot Jason Gonzalez, then the statement would have been improperly admitted. However, that is not what happened at trial. The statement was admitted because, as an adopted admission, it was not hearsay pursuant to Rule 801(d)(2)(B).

■ Furthermore, defendant did not raise at trial the arguments that he now raises. His sole objection at trial was predicated upon the alleged hearsay content of Rodriguez's statement, not on the lack of a *Lerner* inquiry. "As established by this court, an issue that has not been raised and articulated previously at trial is not properly preserved for appellate review." *State v. Donato*, 592 A.2d 140, 141 (R.I.1991); *accord State v. Markarian*, 551 A.2d 1178, 1183 (R.I.1988) ("claims of error are deemed waived unless the specific grounds for the claimed error are effectively raised at trial"). This directive specifically to object to errors at trial, the "raise or waive rule," is well established, and will not be disturbed unless "basic constitutional rights are concerned." *Donato*, 592 A.2d at 141. In this case, defendant had ample opportunity to raise the proper objection at trial. The defendant asserts for the first time on appeal that the *Lerner* criteria were not established at trial. That may be so, but it is defendant's

responsibility to object to the testimony on the proper grounds and then cross-examine the witness to raise doubts about whether the *Lerner* criteria are satisfied. We cannot say that trial counsel's failure to object on the proper grounds is any fault of the trial justice.

Because defendant's objection to the adoptive admission was not properly preserved at trial, we hold that there was no error by the trial justice in allowing the testimony to be admitted.

■ Moreover, we are persuaded that there was sufficient evidence in the record to satisfy the *Lerner* standard. Rodriguez's statement was clearly accusatory, and one to which an innocent person in the situation would be expected to reply. It was made within Gomez's presence, both the defendant and Rodriguez were riding in the same car, the defendant was sitting in the front passenger seat and Rodriguez was in the rear seat. Rodriguez addressed the statement directly to Gomez. His testimony reveals that he confronted Gomez on at least two occasions. At first he asked if he [Gomez] and Rivera were the ones that did it, to which Gomez replied, "nope." Then, when he told Gomez that Rivera had already told him that Rivera and Gomez had done it, Gomez didn't say anything, but just turned his head. From the circumstances of this conversation, it easily can be inferred that not only did Gomez hear the statement, but also that he understood its meaning and clearly had an opportunity to deny or reply to it.

### III

### Conclusion

For the foregoing reasons, the defendant's convictions and the verdicts are af-

firmed. We remand the record to the Superior Court.