## STATE

v.

## Jeffrey ALSTON a/k/a Kam Ausar.

## No. 2004–97–C.A.

Supreme Court of Rhode Island.

June 30, 2006.

Diane Daigle, Esq., for Plaintiff.

Susan B. Iannitelli, Esq., for Defendant.

Present: WILLIAMS, C.J., and GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice ROBINSON for the Court.

The defendant, Jeffrey Alston, a/k/a Kam Ausar,[1] appeals from a jury verdict finding him guilty of felony conspiracy, breaking and entering a dwelling, and felony assault. For the reasons set forth herein, we vacate the judgment of conviction and remand this case to the Superior Court for retrial.

### Facts and Travel

The defendant and one Jerry Coleman were both charged by criminal information with the following crimes: (1) conspiracy to break and enter in violation of G.L.1956 § 11-1-6; (2) breaking and entering without consent of the owner in violation of G.L.1956 § 11-8-2; (3) assault with a dangerous weapon in violation of G.L.1956 § 11-5-2; (4) assault and battery resulting in serious bodily injury in violation of § 11-5-2; and (5) driving a vehicle without the consent of the owner in violation of

---

1. On November 2, 2005, this Court issued an order granting defendant's motion to amend the record to reflect his change of name from Jeffrey Alston to Kam Ausar.

G.L.1956 § 31–9–1 and G.L.1956 § 31–27–9. The following are the facts, as developed at trial, from which those charges stemmed.

On July 3, 2001, at approximately 9:30 p.m., Dennis and Suzanne Laven returned to their Warwick home following an evening of shopping and noticed an unfamiliar vehicle parked by the side of the road near the bottom of their driveway. As they were turning into their driveway, the Lavens also noticed that the door of their house was ajar. After they pulled into the driveway, Mr. Laven exited the vehicle and walked up the stairs leading to the open door. Mrs. Laven opened the garage door, ran into the garage, and turned on the exterior lights of their residence. Mrs. Laven then entered the home and retrieved a portable telephone, which she brought back outside with her.

Mr. Laven testified that he was about halfway up the stairs leading to the door which had been left ajar when he observed two people running out of the sliding glass door at the back of the house. Mr. Laven testified that he then ran back down the stairs and around the house to the backyard. Mr. Laven testified that he then heard some rustling in the woods behind his home but could not see anything because it was too dark. Mr. Laven further testified that he then ran back to the front of the house and down his driveway towards the unfamiliar vehicle that was parked by the side of the road. According to Mr. Laven's testimony, he approached the vehicle, reached in through the open window on the driver's side, and pulled the keys out of the ignition.

Mrs. Laven testified that she called 911 on the portable telephone which she had retrieved from the house and then walked down to the bottom of the driveway towards where her husband was standing. Mr. Laven testified that, after removing the keys from the ignition of the unfamiliar vehicle, he stood in the center of his driveway and waited for the people who had been in his house to emerge from the woods, and they eventually did. Mr. Laven testified that two men came out of the woods and approached the vehicle at the bottom of his driveway. Mr. Laven said that he yelled to the men, "I got the keys, and the police are on their way." According to Mr. Laven's testimony, one of the men, whom he described as being "the larger of the two," started to run towards him saying that he had a knife and was going to stab him. Mr. Laven testified that he then threw the keys into the woods and prepared himself because he knew that there was going to be a fight.

Mr. Laven described what happened next as follows: "[It was like] a collision; and then there was a flurry of punches." Mr. Laven said that, at some point while he and the larger man were fighting, the second perpetrator came up behind him and hit him on the head, causing him to fall to the ground and bang his head. Mr. Laven testified that, while he was on the ground, each of the two men was kicking his head and upper body. According to Mr. Laven's testimony, he eventually rose to his feet, at which point the smaller of the two men went back towards the vehicle while Mr. Laven continued fighting with the larger man. After approximately one or two minutes, the larger perpetrator also went back towards the vehicle. Mr. Laven testified that it appeared as though the two men were trying to find the keys to the vehicle.

According to the testimony of Mr. Laven, the larger of the two men then came back towards him and told him that he had a gun and was going to shoot him. At this point, Mr. Laven testified, he and the larger man started to fight again. Mr. Laven testified that the man then approached his

wife, who was standing in the driveway screaming into the telephone, and threatened to shoot her. Mr. Laven testified that he then yelled to the larger man, "I'll find the keys," at which point the man once again approached Mr. Laven and they engaged in another violent encounter, which Mr. Laven described as "more of a shoving than it was a fighting situation."

At this point, Mr. Laven testified, his wife yelled out to the man: "I've got the keys. Here are the keys." Mr. Laven testified that the larger man then approached his wife, took the keys from her, and went back to the vehicle, where the two men tried to start the car with the keys that Mrs. Laven had given them.[2] According to Mr. Laven's testimony, one of his neighbors then drove into their driveway and the two men, unable to start their vehicle, retreated into the woods on foot. Mrs. Laven gave testimony about the evening's events that was similar to that given by her husband.

Within a minute or so after the perpetrators' final retreat into the woods, the police arrived. Mr. Laven testified that he was "dazed" from being beaten and was taken by ambulance to Kent County Hospital, where he remained for approximately six hours. At the hospital, Mr. Laven dictated a statement to the police, which his wife wrote out, since his own hands were sore from the attack. Mrs. Laven also provided her own separate statement to the police.

As a result of this attack, Mr. Laven suffered lacerations on his face, leg and hands, a bloody nose, injury to his inner ear, immobility of his thumb, and soreness of his wrist. Mr. Laven testified that he later discovered that the ligaments in his right thumb had been severed, and he had

to wear a splint for approximately two months while it healed. Mr. Laven also said that he underwent arthroscopic surgery to reattach torn tendons inside his left wrist. By the time he testified at trial Mr. Laven said that he had fully recovered from the wrist injury, but that he still only had about 70 percent range of motion in his thumb. Doctor Manuel DaSilva, the orthopedic surgeon who treated Mr. Laven, testified similarly at trial, stating that, as of May of 2002, Mr. Laven had regained approximately 90 percent range of motion in his wrist, but that "he never recovered full mobility" of his thumb.

The Lavens were unable to identify either of the two assailants. They did, however, provide the police with descriptions of the two men. In the statement that she gave to police a few hours after the incident, Mrs. Laven described the perpetrators as being two black men in their twenties. She described the larger of the two men as being "perhaps six-two or six-three" and the smaller man as being "five-eight to five-nine." At trial, Mr. Laven described the larger man as being "between about five-eleven to six-three," and the smaller of the two as being "five-nine, five-ten." Mr. Laven further described both men as being "somewhat agile" and athletic.

Detective Daniel Gillis, a member of the Warwick Police Department's Bureau of Criminal Identification, responded to the Laven home to investigate the crime scene. Detective Gillis testified as to certain items that he found inside the vehicle that was parked on the side of the road in front of the Lavens' house. These items included a rental agreement for the vehicle, a cellular telephone, and a wallet.

2. In actuality, the keys which Mrs. Laven handed to the perpetrators were the keys to the vehicle that she and Mr. Laven had been driving that night and not the keys to the vehicle which the perpetrators had been using.

Amy Smith, a friend of defendant's, testified at trial that defendant had called her on June 25, 2001 and asked her to rent a car for him, and she agreed to do that for him. According to Ms. Smith's testimony, she met defendant at Alamo Rental in Warwick that same day and signed a rental agreement for a vehicle. Ms. Smith testified that she listed defendant on the rental agreement as an authorized driver of the car. Ms. Smith further testified that she left Alamo after the necessary paperwork was completed, but before the rental vehicle was delivered to defendant.

According to Ms. Smith's testimony, the next time she spoke with defendant was at 4:45 a.m. on July 4, 2001—at which time defendant called to inform her that the rental vehicle that she had rented for him had been stolen. Based upon this information, Ms. Smith testified, she called Alamo Rental and was told that the vehicle was in the possession of the Warwick Police Department. Ms. Smith testified that she then contacted the Warwick Police Department and was informed that it was necessary for her to go to the police station and provide a statement, which she did.

Ms. Smith testified that defendant called her later that same day to inquire as to whether or not the vehicle had been returned to her. She testified that she informed defendant that the vehicle had not been returned to her and that the vehicle was part of an investigation into a breaking and entering. Ms. Smith further testified that, upon hearing this news, defendant responded, "I got to go," and he hung up the telephone.

William Harrell testified that, in July of 2001, he and defendant were "best friends" and would see each other every day. Mr. Harrell testified that, in the days leading up to July 3, 2001, he had seen defendant driving a rented brown Oldsmobile Alero with Massachusetts plates. On July 4, Mr.

Harrell was watching television and saw a news bulletin about the breaking and entering at the Laven home. Mr. Harrell testified that the news bulletin showed a vehicle that had been involved in the crime—which he concluded was the same rental vehicle that he had seen defendant driving in the preceding days.

Later that same day, Mr. Harrell testified, defendant and Jerry Coleman, another friend of theirs, stopped by Mr. Harrell's house. According to Mr. Harrell's testimony, defendant admitted to him that he had been involved in the breaking and entering that had been described on the news. Mr. Harrell testified that defendant described how he and Mr. Coleman had broken into the Lavens' home and had assaulted Mr. Laven. Mr. Harrell further testified that defendant described how he and Mr. Coleman fled the scene of the crime on foot, ran through the woods, and then eventually stole a screwdriver from a truck and used it to steal another vehicle. Mr. Harrell testified that he initially offered to serve as an alibi witness for defendant. He further stated, however, that in January of 2002 he and defendant had a dispute which left him concerned for the safety of his family. Because of that dispute, Mr. Harrell contacted the police in March of 2002 and spoke with them about defendant's involvement in the crime that was committed in Warwick in July of 2001. Detective Eric Johnson of the Warwick Police Department testified that he interviewed Mr. Harrell on March 4, 2002. According to Detective Johnson's testimony, Mr. Harrell was aware of details about the crime that were not known by the general public.

Karen Lurie, a representative of Verizon Wireless, testified about defendant's Verizon Wireless billing statement for the month of July 2001, which was admitted as a full exhibit at trial. Based upon this

document, Ms. Lurie testified that a call was made at 7:35 p.m. on July 3 from defendant's cellular telephone to a particular telephone number. Robert Hayes, who worked for Verizon Corporate Security, testified that the particular telephone number referenced by Ms. Lurie had a service address of 34 Alexander Street, Providence. Detective Johnson testified that Jerry Coleman resided at that address.

Detective Johnson testified that he had interviewed Mr. Coleman at the Providence Police Station on February 15, 2002. Detective Johnson testified that, at the time of that interview, he had advised Mr. Coleman of his *Miranda*[3] rights and then had him sign a preprinted *Miranda* rights form. Detective Johnson testified that, during his interview at the police station, Mr. Coleman provided him with a written statement regarding the break-in at the Lavens' home. The trial justice then permitted Detective Johnson to read Mr. Coleman's written statement to the jury. Shortly after reading that statement to the jury, in response to questioning by the prosecutor, Detective Johnson testified that the next thing he did after interviewing Mr. Coleman was to complete an arrest warrant affidavit for defendant.[4] That warrant was effectuated by the Providence police on March 6, 2002.

On June 5, 2003, defendant's counsel filed a motion to sever his client's case from that of Jerry Coleman. Significantly, in his memorandum in support of said motion, defense counsel specifically cited the leading case of *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The defendant's motion to sever was granted.[5]

The defendant was tried before a jury in the Superior Court for Kent County in July of 2003. The jury convicted defendant of felony conspiracy, breaking and entering a dwelling, and felony assault. On July 29, 2003, the trial justice denied defendant's motion for a new trial. The defendant was then sentenced to consecutive terms of ten years on the conspiracy charge (five years to be served at the Adult Correctional Institutions and five years suspended, with probation), fifteen years on the breaking and entering charge (five years to be served and ten years suspended, with probation), and ten years on the assault charge (seven years to be served and three years suspended, with probation).

On appeal, defendant argues that his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and under article 1, sections 2 and 10 of the Rhode Island Constitution were violated when the trial justice allowed Detective Johnson to read to the jury the written statement that Jerry Coleman had provided to the police. The defendant also contends that the trial justice erred in permitting the state to question Detective Gillis as to whether or not anyone had come forward to retrieve the personal effects that had been found in the vehicle that was left outside the Lavens' home by the perpetrators. The defendant further argues that it was error for the

**3.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**4.** As will be made clear in Part I of the "Analysis" section of this opinion, Detective Johnson's testimony that the next thing he did after interrogating Mr. Coleman was to complete an arrest warrant affidavit for defendant is not without significance.

**5.** Mr. Coleman's case proceeded to a jury trial in Superior Court. At the conclusion of his trial, Mr. Coleman was found guilty of felony conspiracy, breaking and entering a dwelling, simple assault, and driving without the consent of the owner.

trial justice not to have provided the jury with statements made by Mr. and Mrs. Laven with respect to the physical description of the two perpetrators after the jury requested said statements during deliberations.

## Analysis

### I

### The Admission of Jerry Coleman's Statement

██ The defendant's first argument on appeal is that the trial justice erred, and thereby violated his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and under article 1, sections 2 and 10 of the Rhode Island Constitution, when she allowed the written statement of Jerry Coleman to be read to the jury by Detective Johnson of the Warwick Police Department.

It will be recalled that, during defendant's trial, Detective Johnson was permitted to read to the jury the written statement that Mr. Coleman, whose case had been severed prior to defendant's trial, had provided to the police while he was being interrogated regarding the break-in at the Lavens' home.[6] In addition, shortly after Detective Johnson finished reading the statement to the jury, the following colloquy took place:

> "Q Detective, what was your next— what did you do next, with regard to Mr. Alston, in your investigation?
>
> "A After interviewing Mr. Coleman?
>
> "Q Yes.
>
> "A I completed an arrest warrant affidavit for Jeffrey Alston."

Defense counsel objected on hearsay grounds both to the introduction of Mr. Coleman's statement and to the subsequent questioning of Detective Johnson as to what he "did * * * next with regard to Mr. Alston, in [his] investigation[.]" [7]

6. The following is the text of the written statement that Mr. Coleman provided to the police, as transcribed by the court reporter when Detective Johnson read it to the jury:

> "I, Jerry Coleman, on or about July, did break into a house in Warwick, R.I. Upon entering the house, the front door was open. I went inside. People return home, a man and a woman. At this point I became afraid, and went out of the back door and down the driveway, went to J.C. car; notice keys were missing. Then two people came to car and questioned as to what was happening. Notice they had the keys. At this point, I became physically violent with the two people, because I could not find the keys to the car. So I ran on foot into some woods, until I was clear out of sight; and then proceeded to make my way back to Providence, not before taking a car somewhere in Warwick. I'm not sure where in Warwick I gotten the car, but drove it to Route 10. I then went home to 34 Alexander Street. I had a call from the prison as to what had taken place the night before. And the discussion went, as follows: 'Are you okay?'

> "I said, 'Yes.'
> "This phone call was between eight and eleven a.m. from Priscilla Sims, who told me that her brother Charles Sims was on the phone, and wanted to talk to me about the night before, what was on the news about a break, quote, 'house break,' in Warwick, R.I. What I can recall was the concern about my being okay."

7. Defense counsel objected to both the Coleman statement and to the questioning of Detective Johnson as to what he did "next with regard to Mr. Alston * * *." The objections were essentially based on the rule against hearsay evidence rather than specifically on the holding of the United States Supreme Court in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). However, given what had already transpired by that point (most notably the granting of the motion to sever), we choose to overlook the absence of a more finely tuned objection in this instance.

It is significant to us that, in the course of articulating his objection to the admission of Mr. Coleman's statement, defendant's counsel

After careful consideration of the record and after reviewing the pertinent authorities, we are in agreement with defendant's argument that the trial justice erred in allowing Detective Johnson to read Mr. Coleman's written statement to the jury. We conclude that the admission of Mr. Coleman's statement in this case cannot be reconciled with the principles articulated by the United States Supreme Court in its seminal opinion in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).[8]

In *Bruton*, the United States Supreme Court held that the trial court committed reversible error when, during a joint trial, it admitted the codefendant's confession, which implicated defendant Bruton. 391 U.S. at 124, 126, 88 S.Ct. 1620. The Court held that the admission of the codefendant's confession constituted a violation of the defendant's "right of cross-examination secured by the Confrontation Clause of the Sixth Amendment." *Id.* at 126, 88 S.Ct. 1620. In that case, the confession of Bruton's codefendant was admitted into evidence through the testimony of a third party to whom the codefendant had orally confessed. *Id.* at 124, 88 S.Ct. 1620. The Supreme Court noted that the codefendant's confession "added substantial, perhaps even critical, weight to the Government's case in a form not subject to cross-examination, since [the codefendant] did not take the stand." *Id.* at 128, 88 S.Ct. 1620. In view of this scenario, the Court held that the defendant "was denied his constitutional right of confrontation." *Id.*

In the present case, the Superior Court had granted defendant's motion to sever Mr. Coleman's case from defendant's case before defendant's trial began. The defendant's memorandum in support of his motion to sever had explicitly referenced *Bruton.* It is our opinion that, once a *Bruton*-based decision to sever trials is made, then it is presumptively prejudicial to allow into evidence a confession made by the person whose case has been severed. Accordingly, given the granting of the motion to sever and given the principles set forth in *Bruton*, it was error to then allow Detective Johnson to read to the jury Mr. Coleman's statement to the police.[9]

■ In our judgment, the admission of Mr. Coleman's statement in the instant case cannot be reconciled with the constitutional principles articulated in *Bruton.* *See* 391 U.S. at 126, 88 S.Ct. 1620. Similar to the confession of the codefendant at issue in *Bruton*, the statement of Mr. Coleman, which Detective Johnson read to the jury, added substantial weight to the prosecution's case in a form that was not subject to cross-examination by defendant. Accordingly, applying the principles set

did state: "[If] they want testimony from Coleman, he should be here." That sentence is redolent with Confrontation Clause implications. *See* U.S. Const. Amend. VI ("In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *.").

8. Since we are deciding this case on the basis of long-recognized principles, we need not and do not decide whether or not defendant could also have successfully contended that our "raise or waive rule" is inapplicable in this situation so that he could present to us an argument based on the 2004 decision of the United States Supreme Court in the case of

*Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

9. In a recorded colloquy with the trial justice out of the presence of the jury, the prosecutor in the instant case candidly acknowledged that "the trial was severed for *Bruton* problems * * *." Given the Superior Court's decision to sever the trials of Mr. Coleman and defendant—a decision with which we do not quarrel—the rationale underlying that decision should have called for the utmost caution with respect to the principles set forth in *Bruton.*

forth in *Bruton,* it is our opinion that defendant was denied his constitutional right to confrontation in this case. It is further our opinion that this error was not harmless beyond a reasonable doubt.[10]

The trial justice's error in admitting the Coleman statement was magnified in this case by the subsequent questioning of Detective Johnson as to what he did "next with regard to Mr. Alston," which questioning occurred shortly after the detective had read Mr. Coleman's statement to the jury. This questioning of Detective Johnson, along with the elicited testimony which revealed that what he did "next" was to complete "an arrest warrant affidavit for Jeffrey Alston," demonstrates how potentially prejudicial to defendant was the admission of Mr. Coleman's statement. The shift from the reading of Mr. Coleman's statement about his own involvement in the break-in to the testimony of Detective Johnson that what he did "next" was to prepare for the arrest of defendant had the highly probable effect of further inculpating defendant in the eyes of the jury without his having the chance to cross-examine Mr. Coleman. In effect, the jury was told that Mr. Coleman's statement was the basis for defendant's arrest.

For this reason, we vacate the judgment of conviction and remand this case to the Superior Court for retrial.

Although we are reversing and remanding for a new trial on *Bruton* grounds, we will nevertheless proceed to address one of defendant's other appellate contentions because it involves an issue that may well present itself once again upon the retrial of this case. However, we choose not to comment upon defendant's third conten-tion (namely, that the trial justice erred in not granting the jury's request to review the statements that the Lavens made to the police with respect to the physical description of the two men whom they encountered at their home), because there is no reasonable likelihood that the same scenario will be repeated upon retrial.

## II

### The Questioning of Detective Gillis Regarding Retrieval of the Items Found in the Vehicle

The defendant's next contention on appeal is that the trial justice erred in permitting the state to question Detective Gillis as to whether or not anyone had come forward to retrieve the items that had been found in the vehicle that was parked by the side of the road near the bottom of the Lavens' driveway.

Detective Gillis testified at trial that a rental agreement, a cellular telephone, and a wallet were found inside the vehicle. Detective Gillis further testified that these items were seized from the vehicle and were taken into the custody of the Warwick Police Department along with the vehicle itself. Detective Gillis also testified that a representative from Alamo Rental later came to the police station and retrieved the vehicle. The prosecutor then questioned Detective Gillis as follows: "Aside from the representative from Alamo, did anyone else at any point in time come to the Warwick Police Department to try and retrieve evidence?" At that point, defense counsel objected. Following a lengthy bench conference, during which the jury was not in the courtroom, the trial

---

**10.** The potential prejudicial impact of the reading of the Coleman statement (even prescinding from our discussion in the text *infra* as to the magnifying effect of the subsequent questioning of Detective Johnson as to what he did "next with regard to Mr. Alston") is of such magnitude that in our judgment it could not have been adequately palliated by the giving of an immediate curative instruction, even if one had been given.

justice allowed the state to pursue this line of questioning. Detective Gillis then testified that, other than the Alamo representative and Shannon Laven (the Lavens' daughter), no one else had come to the Warwick Police Department to retrieve any of the property that had been seized by the police.

The defendant makes essentially the same argument on appeal regarding this questioning of Detective Gillis as he made to the trial justice—namely, that the above-quoted question and answer had the effect of permitting the jury to make an inference of guilt based upon defendant's failure to retrieve his belongings from the police department. The defendant argued at trial, and argues before us on appeal, that the posing of this question coupled with the answer of Detective Gillis in effect permitted the state to comment upon his invocation of his Fifth Amendment right to remain silent. The trial justice rejected this argument on the ground that evidence that defendant had not retrieved his belongings from the police department was "not testimonial" in nature.

It is our view that the trial justice correctly allowed the challenged questioning of Detective Gillis, because the Fifth Amendment privilege against self-incrimination was inapplicable in the above-described situation. Both this Court and the United States Supreme Court have clearly established that the Fifth Amendment privilege against self-incrimination extends only to evidence that is testimonial or communicative in nature. *See, e.g., Schmerber v. California,* 384 U.S. 757, 761, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *State ex rel. Widergren v. Charette,* 110 R.I. 124, 132, 290 A.2d 858, 862 (1972).

In *Schmerber,* the United States Supreme Court explicitly held that the Fifth Amendment "privilege protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature." 384 U.S. at 761, 86 S.Ct. 1826. Similarly, in *Charette,* this Court stated that "the great weight of authority supports the conclusion that the '[Fifth Amendment] privilege is a bar against compelling "communications" or "testimony" * * *.'" 110 R.I. at 132, 290 A.2d at 862 (quoting *Schmerber,* 384 U.S. at 764, 86 S.Ct. 1826).

In the present case, the fact of the defendant's failure to retrieve his belongings that had been left in the rental vehicle certainly did not constitute "communication" or "testimony." Accordingly, admitting evidence of the defendant's inaction in the context that we have described did not violate his rights under the Fifth Amendment.

## Conclusion

For the reasons set forth in this opinion, the defendant's appeal is sustained. We vacate the judgment of conviction and remand this case to the Superior Court for retrial. The record may be returned to that court.