**STATE**

v.

**Jeffrey ALSTON, alias John Doe.**

No. 2009–83–C.A.

Supreme Court of Rhode Island.

June 22, 2012.

Christopher R. Bush, Department of Attorney General, for State.

Susan Iannitelli, Esq., for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Chief Justice SUTTELL, for the Court.

The defendant, Jeffrey Alston,[1] appeals from a judgment of conviction for conspiracy to break and enter, breaking and entering of a dwelling, and assault with a dangerous weapon. He also appeals from the denial of his motions for a new trial. On appeal, the defendant contends that his right to confrontation under the United States and Rhode Island Constitutions was violated by the evidentiary rulings of the trial justice, that his right to cross-examine one of the state's witnesses was unduly restricted, and that the trial justice erred in refusing to pass the case. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Procedural History

On April 8, 2002, defendant was charged by criminal information with the following crimes: (1) conspiracy to break and enter in violation of G.L.1956 § 11–1–6; (2) breaking and entering a dwelling without the consent of the owner in violation of G.L.1956 § 11–8–2; (3) assault with a dangerous weapon in violation of G.L.1956 § 11–5–2; (4) assault and battery resulting in serious bodily injury in violation of § 11–5–2; and (5) driving a vehicle without the consent of the owner in violation of G.L.1956 § 31–9–1 and G.L.1956 § 31–27–9.[2] A trial commenced, and, on July 9, 2003, a jury found defendant guilty of the first four counts. The trial justice sentenced defendant to ten years at the Adult Correctional Institutions (ACI) on the conspiracy charge, with five years to serve and five years suspended, with probation; fifteen years at the ACI on the breaking-and-entering charge, with five years to serve and ten years suspended, with probation; and ten years at the ACI on the assault charge, with seven years to serve and three years suspended, with probation. All sentences were to run consecutively. The defendant appealed to this Court, which resulted in the judgment of conviction being vacated and the case being remanded for a new trial. *See State v. Alston*, 900 A.2d 1212, 1221 (R.I.2006).

The defendant's second trial was held in April 2008, but only on the charges of conspiracy to break and enter, breaking and entering, and assault with a dangerous weapon. The trial record reveals the following facts. On July 3, 2001, at approximately 9 p.m., Dennis and Suzanne Laven returned to their house in the City of Warwick after an evening of shopping and became suspicious of a car parked on the side of the road approximately twenty feet from their driveway. Upon approaching the house, Mr. Laven noticed that the

1. Jeffrey Alston is defendant's birth name; however, he legally changed his name to Kam Ausar. Because defendant was charged for the crimes at issue under his birth name and the trial justice used this name for purposes of the trial, this Court also shall proceed to call defendant by his birth name, Jeffrey Alston.

2. One Jerry Coleman also was charged with the same five counts as defendant in the criminal information; however, a motion to sever defendant's case from Coleman's was granted, and defendant and Coleman each proceeded to trial separately. *See State v. Alston*, 900 A.2d 1212, 1213–14, 1217 & n. 5 (R.I. 2006).

front door was open and that a kitchen light was on, which, he testified, was not the case when the couple had left their home earlier. Mr. Laven then saw two men "running out the sliding doors of the kitchen to the backyard." He yelled to his wife to call the police and then ran around the side of the house to "try to catch the people." Mrs. Laven testified that she turned on the floodlights and then called 911 to report the break-in.

Mr. Laven testified that although his backyard was "pitch black," he could hear rustling noises coming from the woods, so he ran back to the vehicle parked near the bottom of his driveway. Upon reaching the vehicle, Mr. Laven noticed that the keys had been left in the ignition, so he took them and stood in the middle of the road in anticipation that the two men would return.[3] Mr. Laven testified that "[a]fter a few minutes," he heard more rustling noises and saw the two men come out of the woods, whereupon he called out to them that he "had the keys and the police were on their way." According to Mr. Laven, the "larger of the two men rushed at" him, saying that "he had a knife [and that] he was going to cut [Mr. Laven] open."[4] In response, Mr. Laven threw the keys into the woods and a "street fight"[5] ensued. The second man also "came running and gave [Mr. Laven] something similar to a cross check to [his] body and hit [him] in the head with * * * a forearm or a fist." Mr. Laven testified that he was knocked down so fast that he did not have enough time to break the fall

and, in turn, hit his head against the ground. He further testified that, while he was on the ground, the two men continued to kick his sides.

Mr. Laven testified that, at some point, the two men retreated from the fight, went back to the car parked on the street, and "seemed to be looking for the keys." The next thing that Mr. Laven could recall was that the taller man returned and started fighting with him again. The man, however, again withdrew, threatening that "he was going to shoot [Mrs. Laven]." Mr. Laven then yelled out that he would help look for the keys because he "was afraid for [his] wife." When that same man approached Mrs. Laven, she testified that she gave him her own set of car keys, and he returned to the parked car. According to Mr. Laven, both men "seemed to be scrambling [to try] to get the keys in the car," but he added that it was not long before they "realize[d that] they were not the keys to [their] car." At that point, the Lavens' neighbors drove up their own driveway, causing the two men to flee into the woods.

When asked at trial to describe the two men, Mr. Laven testified that the first man to approach him was "dark skinned," between five-foot-eleven inches and six-foot-two inches tall, approximately 220 pounds, and had been wearing "bulky" clothing and a "toque," which Mr. Laven described as "a ski cap."[6] Mr. Laven described the second man as "dark skinned" and between five-foot-ten inches to five-foot-elev-

---

3. The lighting in the street, according to Mr. Laven, was "extremely poor" because there was only one light approximately twenty to thirty feet from where he was standing.

4. Mr. Laven testified, however, that he did not see a knife in the man's hands at any point.

5. According to Mr. Laven, the "street fight" consisted of "wrestling, grabbing, shoving, hitting, [and] punching."

6. Mrs. Laven testified that the first man was "solidly built," black, and "as tall" or taller than her husband, whom she said was "shy of six-one."

en inches tall.[7] The Lavens, however, were unable to affirmatively identify anyone from a photo array of possible suspects, and they also could not positively identify defendant as one of their two assailants at the trial.

Daniel Gillis, a detective in the Warwick Police Department, testified that on July 3, 2001, he received a telephone call to investigate the crime scene at the Lavens' home. Detective Gillis testified that, upon responding, he conducted a search of the abandoned vehicle, which produced, among other things, a cellular telephone, a cellular-telephone charger, an Alamo car rental agreement, and a black wallet holding some money, credit cards, and defendant's Rhode Island driver's license. The keys that Mr. Laven had thrown into the woods also were located. According to Det. Gillis, the keys were later "matched up to" the abandoned vehicle.

Amy Smith, a friend of defendant's, testified that in June 2001, defendant had called her and asked her to rent a car for him, claiming that he did not have a credit card to do so himself. Smith stated that she agreed to defendant's request.[8] On June 25, 2001, she met defendant at Alamo, a car rental company, and cosigned the paperwork but left before defendant took possession of the rental car. According to Smith, the next time that she heard from defendant was on July 4, 2001, at approximately 5:45 a.m., when defendant called her and told her that the rental car had been stolen. During this call, Smith testified, defendant informed her that he had attempted to report the theft, but that she needed to call Alamo because "the authorized renter had to call."

When Smith called Alamo, she was informed that the rented vehicle was then at the Warwick police station. Smith testified that when she went to the police station to get a release for the car, she learned that the car was involved in a continuing investigation for a break-in. According to Smith, when she spoke with defendant that same evening, he asked her what had happened when she called the car rental company. She testified that she told defendant that the car had been involved in a break-in, and that defendant then stated, "Okay. I got to go."

Walter Williams, a civilian criminalist in the Warwick Police Department and an expert in fingerprint detection, analysis, and comparison, testified that he was able to develop fingerprints from the vehicle that had been abandoned at the Lavens' house and that some of the fingerprints matched those of defendant. Williams additionally testified that he also was able to match a palm impression taken from the vehicle to that of a man named Jerry Coleman.[9] He was not, however, able to tell when the prints had been imported to the vehicle, agreeing that it was possible that one set of the prints "may have been placed for a relatively longer period of time or remained on [the] vehicle a relatively longer period of time than the other."

William Harrell,[10] who described defendant as being "like a brother" to him, testified that on July 4, 2001, he saw a

---

7. Mrs. Laven stated that the second man also was black, and she said that he was shorter and "a little stockier" than the first man.

8. Smith also testified that this was the second time that she had rented a car for defendant, that defendant told her that he needed the rental car because he was going out of town,

and that he reimbursed her in cash for the cost of the rental car.

9. According to Williams, Jerry Coleman also is known as Jerry Jenkins.

10. William Harrell testified that he also goes by the name Osiris Harrell.

news bulletin about a break-in at a house in Warwick. According to Harrell, this news bulletin caught his eye because he recognized the vehicle that was featured as the car he had seen defendant driving the day before. Harrell testified that approximately twenty minutes after he saw the news bulletin, defendant arrived at his house with Coleman.

According to Harrell, when he asked defendant how he got away with the break-in, defendant "started to tell [him] about the night prior and the * * * [break-in] and what happened, how it happened[,] and how he ended up getting away." Harrell testified that defendant told him that he and Coleman went to a house in Warwick "to burglarize it." According to Harrell, defendant also told him how they had "left the car running in the driveway" while they broke into the house, "left the door to the house ajar[ ]" because they were "taking things out," how the homeowners returned and "took the keys out of the car," and how defendant attempted to get the keys back from the homeowner by "beat[ing] him * * * up."

Harrell also testified that defendant told him about "[t]he getaway," stating:

"[The defendant] told me that they weren't able to retrieve the keys from the owner and because of the time that had already been spent there trying to get the keys that they ran and they ran, they really didn't know where they were, and at some point, they ended up in a dense forest or wooded area * * *.

"* * *

"[A]t some point, they came upon a truck, and they were inside the truck, and there was a screwdriver, and they

took the screwdriver, they * * * eventually came upon a car, and that car was used to get out of that area and get back to Providence * * *." [11]

Harrell further testified that defendant and Coleman informed him that defendant's wallet, identification, and cellular telephone had been left in the vehicle they abandoned. Harrell attested that he had "offered to provide an alibi" for defendant, but that defendant never took him up on his offer. When Harrell was asked whether he ever went to the police with this information, he stated that he did, but not until seven months later because he and defendant had "a falling out."

Eric Johnson, a detective in the Warwick Police Department, testified that during his investigation of the break-in at the Lavens' residence, he reviewed the evidence seized in this case, which included, among other things, defendant's birth certificate, Social Security card, and driver's license in the wallet that had been discovered inside the abandoned vehicle. Detective Johnson stated that defendant's driver's license indicated that he was six feet tall and weighed 180 pounds. The detective, having "had an opportunity to be in" Coleman's presence after the break-in in February 2002, testified that Coleman was "slender" and "[a] little shorter" than five-feet-nine inches tall. According to Det. Johnson, the cellular telephone that had been found in the vehicle was registered to defendant's name and address and, from obtaining defendant's cellular-telephone records, the detective was able to determine that on July 3, 2001, at 7:35 p.m., a call was placed from defendant's cellular

11. John T. Sutton testified that on July 4, 2001, between 3:30 a.m. and 4:30 a.m., his car, "an older model Oldsmobile," was stolen. Dennis Gamba, owner of the Cranston Collision Center, testified that a tow log, dated July 4, 2001, at 8:15 a.m., showed that the Rhode Island State Police requested that a 1984 Oldsmobile Cutlass with the same Rhode Island registration number as Sutton's stolen vehicle be towed.

telephone to a number connected to Coleman's address.[12]

Detective Johnson also testified that on July 4, 2001, a car was reported stolen from a residence approximately two to three miles from the Lavens' house, which subsequently was recovered "a few blocks" from Coleman's house. Detective Johnson, at trial, conveyed the investigation's progress: An arrest warrant for Coleman was obtained on February 16, 2002, an arrest warrant for defendant was obtained on February 18, 2002, Harrell was interviewed on March 4, 2002, defendant's photograph was broadcast on the local news on March 5, 2002, to announce that defendant was wanted by the police, and defendant was arrested on March 6, 2002.

■ On April 7, 2008, the jury found defendant guilty of all three charges. Subsequently, defendant filed a motion for a new trial, which was denied on July 24, 2008, from which he filed a notice of appeal *pro se* on August 4, 2008. On August 22, 2008, defendant was sentenced to consecutive terms of ten years to serve on the conspiracy charge, ten years to serve on the breaking-and-entering charge, and twenty years to serve on the felony-assault charge. On the same day, defendant, through counsel, filed a notice of appeal

from the judgment of conviction. We deem his direct appeal to be timely, notwithstanding the fact that the judgment of conviction was filed on September 23, 2008.[13] *See Chapdelaine v. State*, 32 A.3d 937, 941 n. 1 (R.I.2011) (noting that we treat an appeal filed before entry of final judgment as timely). Additional facts will be supplied as needed.

## II

### Discussion

■ On appeal, defendant first argues that his right to confrontation, guaranteed by the United States and Rhode Island Constitutions, was violated by certain evidentiary rulings of the trial justice concerning the testimony of Harrell. Specifically, defendant asserts that the trial justice erroneously allowed certain statements made by Coleman, defendant's coconspirator, to come into evidence through Harrell's testimony as either admissions or adoptive admissions. Second, defendant contends that his right to cross-examine Smith was unduly restricted. Third, defendant asserts that the trial justice erred in refusing to pass the case after Harrell made an "inherently inflammatory" statement that served "no proper prosecutorial function."[14]

12. Additionally, Det. Johnson testified that defendant's cellular-telephone records showed that no outgoing or incoming telephone calls were made to or from defendant's cellular telephone after the July 3, 2001, 7:35 p.m. telephone call to the number connected to Coleman's address.

13. In addition to the August 4, 2008 and August 22, 2008 notices of appeal, defendant filed two other notices of appeal *pro se* to this Court in relation to this case: an October 2, 2008 notice of appeal from the denial of his motion to reduce sentence and an October 30, 2009 notice of appeal from the denial of his second motion for a new trial. Pursuant to Article I, Rule 30 of the Supreme Court Rules of Appellate Procedure, an appeal from a

judgment of conviction preserves for this Court's review any allegation of error in an order related to a motion for a new trial, and we shall treat any such appeal as an appeal from the judgment. Therefore, this opinion applies to the notices of appeal dated August 4, 2008, August 22, 2008, and October 30, 2009. We address, however, only those issues that defendant raised in his brief; all other issues are deemed waived. The defendant's October 2, 2008 notice of appeal from the denial of his motion to reduce sentence shall be docketed separately.

14. The defendant, in his Rule 12A statement, seemingly argues that the trial justice also erred by admitting his wallet into evidence, by determining that Detective Stephen J. Spring-

## A

### The Testimony of William Harrell

The defendant argues that the only evidence placing him at the scene of the crime was the testimony of Harrell; yet, Harrell had no personal knowledge of the events of July 3, 2001. His testimony, rather, concerned conversations he had with defendant and Coleman on July 4, 2001. With respect to Harrell's testimony concerning statements made by defendant, defendant contends that, although Harrell described the conversation in general terms, he was unable to quote defendant directly. Pertaining to Harrell's testimony concerning statements that Coleman made, defendant argues that such statements should not have been admitted as adoptive admissions or coconspirator statements and that their admission into evidence deprived defendant of his constitutional right to confront Coleman. Finally, defendant contends that Harrell's testimony often was unclear about whether defendant or Coleman was the declarant; thus, his testimony lacked the requisite "indicia of reliability * * * to satisfy the Confrontation Clause."

### 1

### The Defendant's Statements

The defendant acknowledges that had Harrell recited defendant's words verbatim, such testimony would have been admissible as defendant's own admissions pursuant to Rule 801(d)(2)(A) of the Rhode Island Rules of Evidence.[15] He contends, however, that Harrell's testimony was improperly admitted into evidence because "Harrell repeatedly failed to actually quote statements purportedly uttered by [defendant]," which resulted in "continuous nonresponsive conclusions" and "pure hearsay" being presented to the jury. To support this contention, defendant accentuates specific portions of Harrell's testimony that, he claims, "illustrate the continuing tendency of [Harrell] to substitute his own impressions for actual admissions of [defendant]."

■ "We give considerable latitude to a trial justice's rulings made during examination of witnesses at trial." *State v. Gomez*, 848 A.2d 221, 237 (R.I.2004). "We overturn such rulings 'only when there has been an abuse of discretion or substantial injury to a defendant.'" *Id.* (quoting *State v. Boillard*, 789 A.2d 881, 886 (R.I.2002)).

■ On appeal, defendant cites the following two passages to support his contention that Harrell's testimony did not consist of defendant's own declarations:

(1) "[The Court]: * * * [W]hat, if anything, did [defendant] tell you he did

er's narrative report had been properly provided to him through discovery, and by instructing the jury that it could use flight as evidence of defendant's culpability. Although defendant indicates that these were errors committed by the trial justice, he did not argue them sufficiently to enable us to adequately review them. Moreover, defendant did not raise any of these issues in his full brief. "This Court has held that '[s]imply stating an issue for appellate review, without a meaningful discussion thereof or legal briefing of the issues, does not assist the Court in focusing on the legal questions raised, and therefore constitutes a waiver of that issue.'"

*State v. Chase*, 9 A.3d 1248, 1256 (R.I.2010) (quoting *Wilkinson v. State Crime Laboratory Commission*, 788 A.2d 1129, 1131 n. 1 (R.I. 2002)). Accordingly, we deem these issues, which were not argued with particularity in defendant's brief, to be waived on appeal.

15. Rule 801(d)(2)(A) of the Rhode Island Rules of Evidence states, in pertinent part, that "[a] statement is not hearsay if * * * [t]he statement is offered against a party and is * * * the party's own statement, in either the party's individual or a representative capacity * * *."

in order to get the keys back from the owner?

"[Harrell]: He—I guess the best way to put it is he assaulted him.

"[State:] What did [defendant] tell you, not the best way to put it, but what did [defendant] tell you he did in order to get those keys back?

"[Harrell:] He beat him up, I guess, yeah, beat him up."

(2) "[State:] Did he tell you how it was that he was able to use [the getaway] car or what manner it was?

"[Harrell:] I don't know that, no. I mean, just the fact that, you know, a screwdriver was taken from the truck, and then they came upon a car, so anything beyond that, I would be—just assume that they used the screwdriver."

Although he now emphasizes these two colloquies to support his argument, defendant failed to properly preserve this issue for appeal because he did not raise a timely objection at trial, nor did he move to strike these statements. This Court previously has stated that our "well-settled 'raise-or-waive' rule precludes us from considering at the appellate level issues not properly presented before the trial court."[16] *State v. Goulet,* 21 A.3d 302, 308 (R.I.2011) (quoting *State v. Merida,* 960 A.2d 228, 236 (R.I.2008)). "[U]nder our 'raise-or-waive' rule, an issue not preserved by specific objection at trial, may not be subsequently considered on appeal." *Id.* Thus, because defendant made no objection to Harrell's quoted testimony at

trial, we consider his argument concerning these two statements waived.

The defendant further refers us to the following portion of Harrell's testimony to support his argument that Harrell was "substitut[ing] his own impressions for actual admissions of [defendant]":

"[State:] What do you mean a scuffle ensued? What did [defendant] tell you happened?

"[Harrell:] That he tried to get the keys back from the owner of the house.

"[State:] And what exactly did he do to try to get those keys back?

"[Defendant]: Objection.

"[Court]: Basis?

"[Defendant]: Not—what he related, not what did he do.

"[Court]: That's correct. That question is stricken. Mr. Harrell, the question to you right now is what, if anything, did [defendant] tell you he did in order to get the keys back from the owner?"

In this instance, defendant's challenge to the form of the question posed to Harrell was, in fact, sustained, and the question was rephrased by the trial justice to comport with defendant's objection. He cannot now complain that the trial justice agreed with his request.

Another example that defendant cites to support his argument is when Harrell was asked: "Did [defendant] tell you during this conversation whether he went to this home in Warwick alone or with somebody else?" to which Harrell replied: "[A]t some point, it became clear that it was him and [Coleman]." The defendant objected and

---

16. This Court has acknowledged that a "narrow exception to our 'raise-or-waive' rule" exists. *State v. Goulet,* 21 A.3d 302, 308 n. 13 (R.I.2011) (quoting *State v. Merida,* 960 A.2d 228, 236 n. 16 (R.I.2008)). "For that exception to apply, however, 'the alleged error must be more than harmless, and the excep- tion must implicate an issue of constitutional dimension derived from a novel rule of law that could not reasonably have been known to counsel at the time of trial.' " *Id.* (quoting *Merida,* 960 A.2d at 236 n. 16). We are of the opinion that this narrow exception does not apply to defendant's argument on appeal.

moved to strike Harrell's response as "nonresponsive," and the trial justice "[o]verruled on that basis." The defendant did not suggest any additional basis upon which Harrell's statement should have been stricken.

■■■ "In determining whether the failure of a trial justice to grant a motion to strike constitutes reversible error, this [C]ourt must decide if the alleged error had an adverse effect on [the] defendant's case." *State v. Parente*, 460 A.2d 430, 436 (R.I.1983). "If defendant is not prejudiced, then the error is not reversible." *Id.* "Moreover, the determination of whether a questioned statement is harmless or improperly prejudicial is addressed to the sound discretion of the trial justice." *Id.*

It is clear from the record that Harrell's response, although vague, was responsive to the state's question. This further was exemplified in Harrell's subsequent answer, in which he clarified:

"[H]onestly, I don't know which of the two was the first one to say that they were together. * * * It could have been [Coleman] that first said it to me, or it may have been [defendant] that first said it to me. But somewhere during the course of us talking, it became apparent that they were together. I don't know which one told me first, but at some point, it was corroborated by them both."

Although Harrell could not recall whether it was defendant or Coleman who first told him that they were together, Harrell testified that the fact that the two were together during the break-in was "corroborated by them both." We cannot say, therefore, that "the alleged error had an adverse effect on defendant's case." *Parente*, 460 A.2d at 436. We further note that defendant moved to strike Harrell's response only on the basis that it was nonrespon-

sive; he did not object on hearsay grounds. This Court has held that if, "at trial, 'the introduction of evidence is objected to for a specific reason, other grounds for objection are waived and may not be raised for the first time on appeal.'" *State v. Bettencourt*, 723 A.2d 1101, 1107 (R.I.1999) (quoting *State v. Neri*, 593 A.2d 953, 956 (R.I.1991)). Thus, we find no abuse of discretion in the trial justice's determination to overrule defendant's motion to strike this statement on the ground that it was nonresponsive, and we deem any such objection on hearsay grounds to have been waived.

The final colloquy that defendant points us to is the following:

"[State:] * * * [W]hen you said [defendant] proceeded to tell you what happened, what exactly did he tell you?

"[Harrell:] He started to tell me about the night prior and the break, the breaking and entering and what happened, how it happened and how he ended up getting away and—

"[State:] What did he tell you?

"[Defendant]: I'm going to object. Move to strike that as nonresponsive. He didn't—this witness is not reciting any direct statement by this defendant but giving a generalization of qualification as to what he believed was said.

"[Court]: Well, he didn't say this is what he believed he said. He has given us an outline of the subject matter of the comments allegedly given to him that day by [defendant], so I'm going to overrule the objection."

The record shows that Harrell subsequently testified to defendant's direct statements about both the breaking and enter-

ing, as well as the getaway.[17] Therefore, we are of the opinion that the trial justice's decision to overrule defendant's objection was neither an abuse of discretion nor improperly prejudicial.

## 2

### Coleman's Statements and Defendant's Right to Confrontation

The defendant argues on appeal that his right to confrontation under the United States and Rhode Island Constitutions was violated when statements made by Coleman were admitted as defendant's adoptive admissions through Harrell's testimony. According to defendant, the trial justice disregarded "the fact that the statements made by * * * Coleman to * * * Harrell were beyond the aims of the conspiracy," and, therefore, he erred by permitting the substance of Coleman's statements into evidence through Harrell's testimony without providing defendant his right to confront Coleman. As such, defendant contends that the admission of these statements by the trial justice over his objection was "clear error."

 "The Confrontation Clause contained in the Sixth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, as well as article 1, section 10, of the Rhode Island Constitution, guarantee an accused the right to be confronted with the 'witness' against him." State v. DeJesus, 947 A.2d 873, 882 (R.I.2008). The Confrontation Clause permits the admission of testimonial statements of witnesses absent from trial "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." Crawford v. Washington, 541 U.S. 36, 59, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); see also State v. Bergevine, 942 A.2d 974, 979 n. 3 (R.I.2008) (noting that "testimonial statements are subject to the Confrontation Clause of the Sixth Amendment to the United States Constitution"). "A statement is testimonial if it is 'a solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" State v. Ramirez, 936 A.2d 1254, 1266 (R.I.2007) (quoting Davis v. Washington, 547 U.S. 813, 824, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006)).

 The defendant, in his brief, concedes that the statements, which on appeal he argues violated his right to confrontation, were not testimonial. However, at trial, defendant argued that Harrell's testimony about Coleman's statements created "a Bruton problem" because "the statements were attributed to someone other than this defendant." The Supreme Court, in Bruton v. United States, 391 U.S. 123, 137, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), held that the admission of a codefendant's confession during a joint trial "posed a substantial threat to [the defen-

---

**17.** Harrell subsequently testified to "the details" of the break-in and the getaway as they were relayed to him by defendant. Specifically, Harrell testified that defendant told him that he and Coleman had "got to the house, and no one was home * * *. They left the car running in the driveway of the house, and then they went inside. * * * [O]nce inside, they began to look around for * * * things to loot, and somehow they had left the door to the house [open]." Harrell continued: "[The defendant] told me that they weren't able to retrieve the keys from the owner and because of the time that had already been spent there trying to get the keys that they ran and they ran, they really didn't know where they were, and at some point, they ended up in a dense forest or wooded area." Additionally, Harrell testified that defendant told him that "at some point, [defendant and Coleman] came upon a truck, and they were inside the truck, and there was a screwdriver, and they took the screwdriver, they went on to more and eventually came upon a car, and that car was used to get out of that area and get back to Providence."

dant's] right to confront the witnesses against him." Further, although the trial justice had provided clear jury instructions to disregard the confession because it inculpated the defendant, the Supreme Court held that "in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for [the defendant's] constitutional right of cross-examination." *Id.*

We agree with the trial justice's determination that defendant's *Bruton* argument is unavailing. The confession of the codefendant at issue in *Bruton*, 391 U.S. at 124, 88 S.Ct. 1620, clearly was testimonial in nature because it had been obtained by a postal inspector acting under the direction of the police during the course of two interrogations while the codefendant was in custody at a city jail, which triggered the defendant's rights under the Confrontation Clause. Because Coleman's statements to Harrell were not testimonial in nature, defendant's constitutional right to confrontation was never triggered. Although Harrell's testimony did not present a confrontation issue, it did raise a hearsay concern. Therefore, we will turn to defendant's alternative argument that Coleman's statements should have been excluded from evidence because they constituted inadmissible hearsay.[18]

■ The trial justice stated that "the statement of a co-venturer made in the presence of his other co-venturer to which he does not voice an objection is admissible evidence." Rule 801(d)(2)(B) provides that a statement is not hearsay if it "is offered against a party and is * * * a statement of which the party has manifested his or her adoption or belief in its truth * * *." "A party may adopt a statement by means of conduct: 'The adoption may be express * * * or silent, if the party reasonably could be expected to protest a statement made in his presence if he believed it was untrue.' " *Gomez*, 848 A.2d at 236 (quoting Advisory Committee's Note to Rule 801(d)(2)(B)). "Where a statement is made within the presence and hearing of an accused which is incriminatory or accusatory in character and such statement is not denied by him, the statement and the fact of his failure to deny are admissible as an admission of the statement's truth." *Id.* (quoting *State v. Lerner*, 112 R.I. 62, 83–84, 308 A.2d 324, 338 (1973)).

■ There are "five criteria that a trial justice should consider when ruling on the admissibility of incriminating statements made within hearing of an accused when the statement is not denied." *Gomez*, 848 A.2d at 236. The five criteria are set forth in *Lerner*, 112 R.I. at 84, 308 A.2d at 338, and are as follows: (1) whether "the statement was incriminating or accusatory;" (2) whether "it was one to which an innocent person in the situation of the defendant would reply;" (3) whether the statement "was made within the presence and hearing of the defendant;" (4) whether the defendant "understood the meaning of the statement;" and (5) whether the defendant "had an opportunity to deny or reply to the statement." This

---

18. We note that defendant extensively argues in his brief that Coleman's statements were "not valid co-conspirator statements within the meaning of [Rule 801(d)(2)(E)] as they were made following the accomplishment of the aims of the alleged conspiracy," and that, "[n]othing in the testimony of Harrell suggested that the aims of the conspiracy were furthered by the discussion between [defendant, Coleman, and Harrell] on July 4, 2001." Although the trial justice used the terminology "co-venturer," we do not deem it necessary to decide whether Coleman's statements were admissible as statements made in furtherance of a conspiracy because it appears to us that the trial justice admitted the statements under Rule 801(d)(2)(B), as defendant's adoptive admissions.

Court also has held that "a determination of whether an out-of-court statement meets an exception to the hearsay rule is within the trial justice's discretion." *Rhode Island Managed Eye Care, Inc. v. Blue Cross & Blue Shield of Rhode Island,* 996 A.2d 684, 692 (R.I.2010). "We will not overturn a trial justice's decision in this regard unless it was an abuse of discretion." *Id.*

We are satisfied that, although the trial justice did not make specific findings with respect to the five factors set forth in *Lerner,* there nevertheless was sufficient evidence to support his evidentiary rulings on Harrell's testimony about Coleman's statements. The majority of Harrell's testimony focused on conversations that he had either alone with defendant or together with defendant and Coleman [19]—the man alleged to have been with defendant at the time of the crimes—which conversations occurred in the "late morning" or "very early afternoon" on the day after the crimes transpired. Harrell never indicated during his testimony that defendant denied anything that Coleman said during this conversation; rather, he testified that both defendant and Coleman "corroborat-

ed" certain facts about the crime and provided their own versions of what happened,[20] which is why Harrell said that he had trouble remembering exactly who had said what.[21] Accordingly, we perceive no error in the trial justice's admittance into evidence Harrell's testimony about statements that Coleman made in the presence of defendant.[22]

### 3

### Harrell's Testimony when Declarant was Undistinguishable

■ The defendant also argues that "Harrell's testimony continually failed to distinguish whether he was referring to [defendant] or * * * Coleman as the declarant," and that Harrell's confusion about the identities of the declarant "should * * * require a finding that the statements are not reliable and therefore not admissible." Although it is clear that Harrell candidly acknowledged that often he could not recall whether it was defendant or Coleman who made a particular statement during their conversation, we reject defendant's contention that this issue was adequately preserved for appellate review.

19. Harrell testified that "at one point, [defendant] and [he] talked separately," but also that "there was a point where the three of [them] were talking." He explained that they were lifting weights together and, when defendant "took his turn on the weights[,] * * * [Coleman] chimed in and started saying his version." Further, Harrell testified that some of this conversation took place "while the three of [them] were sitting together in [a] car."

20. Harrell testified that after defendant first arrived at his house, he "talk[ed] to [defendant] alone," at which time defendant told him "about how he had gotten away, * * * about the [break-in and] the mistakes that were made," "how [defendant and Coleman] had gotten away * * *[,] the car being left running, the door being left ajar, [and] his

[identification card] and his wallet and his cell phone being left in the car."

21. The defendant, appropriately, attacked Harrell's credibility during cross-examination about his testimony, his recollection of the conversation at issue, and his motivation for speaking to the police about defendant.

22. We acknowledge Harrell's testimony that "[w]hen [Coleman] and I were speaking, it was pretty much out of [defendant's] earshot." This response was made during Harrell's redirect examination, long after the trial justice had ruled that Harrell's testimony concerning his conversation with Coleman was admissible. The defendant did not move to strike Harrell's earlier testimony, pass the case, or otherwise ask the trial justice to revisit his original ruling.

The defendant refers to five responses given by Harrell to support his contention that Harrell's testimony lacked sufficient indicia of reliability. In one such instance, defendant's objection was sustained and, in two others, no objection was made at all. A fourth colloquy was as follows:

"[State:] Now, you've indicated that you have this one conversation with [defendant], and then you had a separate conversation with both he and [Coleman]?

"[Harrell:] I think it was more like [defendant] and I was talking first, and then [defendant] took his turn on the weights because he was lifting, and while he was doing that, [Coleman] chimed in and started saying his version and giving me, you know, his version of it as well.

"[State:] At any point in time during these conversations that you had, did you ever discuss with [defendant] whether or not any personal items were left behind in the car?

"[Harrell:] I did, because it was mentioned on the news I believe that the—

"[Court]: Just—

"[Harrell:] No. No. No. It wasn't—

"[Court]: Just let me interrupt you there. We don't want to hear what they told you on the news.

"[Harrell:] In fact—

"[Court]: All we want to hear is what did the defendant tell you.

"[Harrell:] Again, it wasn't that I heard it on the news; I think it was—see, I can't even say which one told me; all I know is that [defendant's] I.D. and his wallet was left in the car. I don't know if [Coleman] told me that or if [defendant] told me that.

"[State:] Okay. So his wallet and I.D. Did they indicate whether or not anything else was left in the car?

"[Harrell:] Not to my—not that I can recall, but I know for certain that his wallet and his I.D. was left in the car because that—at that point, I had offered to, kind of, like, help, kind of offer an alibi if it came to that.

"[Defendant]: Objection. Move to strike.

"[Court]: Granted.

"The jury shall disregard that. That was just volunteered information; it's not part of the evidence in the case. We'll wait for another question."

Again, the only objection interposed by defendant was sustained, and Harrell's answer was stricken.

The fifth portion of Harrell's testimony that defendant cited is as follows:

"[State:] Okay. And what did you and [defendant] talk about with respect to the car and the report of it being stolen?

"[Harrell:] I think that I was concerned that—

"[Defendant]: Objection.

"[Harrell:] I remember—

"[Court]: Just a minute, Mr. Harrell. We don't really need to know your mental processes. We just need to listen to the question that was asked and answer that question. So just wait a minute because [the stenographer] is going to read back the question that was asked to you.

"(Previous question read back by the stenographer)

"[Harrell:] I can remember being concerned—

"[Defendant]: Objection.

"[Court]: That answer will be stricken. We don't care ·if you were concerned or whatever. We just want to know what you and [defendant] talked about, if anything, regarding the car being reported stolen—

"[Harrell:] Again, I remember stressing that—I remember stressing to him that, you know, the car, because the timing of when the car was reported stolen.

"[Defendant]: Objection. This is not a relay of the conversation.

"[Court]: Well, I believe it is. Overruled.

"You may continue, Mr. Harrell. This is a conversation you had with the defendant?

"[Harrell:] Yes, sir."

We perceive no abuse of discretion in the trial justice's ruling.

## B

### The Cross–Examination of Amy Smith

 During defendant's cross-examination of Smith, he asked her whether, after speaking to the Warwick police, she believed that he was a suspect in the case. The state objected, and the trial justice sustained the objection. The defendant then continued his cross-examination with a different line of questioning. On appeal, defendant argues that if the trial justice had overruled the state's objection, "he might have been able to establish that the police had concluded [that defendant was] one of the assailants based only on the recovery of the wallet, telephone[,] and [car rental] agreement at the scene, for which there may well have been a plausible explanation."

 "This Court repeatedly has recognized the well-established, constitutionally-protected right of a criminal defendant to effective cross-examination of the prosecution's witnesses." *State v. Dubois*, 36 A.3d 191, 198 (R.I.2012). This, however, is not an absolute right. *Id.* When we review a contention that a defendant's right to cross-examination erroneously was limited by the trial justice, we look to whether the trial justice clearly abused his or her discretion when limiting the scope of the cross-examination. *State v. Peoples*, 996 A.2d 660, 664 (R.I.2010). Our review of the record reveals that, when the state objected to defendant's question, defendant did not make any offer of proof that the examination he intended to embark upon could lead to relevant evidence. *See State v. Brown*, 709 A.2d 465, 474 (R.I.1998) (upholding the trial justice's limitation of cross-examination because the defendant failed to make an adequate proffer of evidence to show that further cross-examination would have evoked probative evidence). In light of defendant's failure to make such offer of proof, we hold that the trial justice did not abuse his discretion in sustaining the state's objection to this question.

## C

### Motion to Pass the Case

The defendant further argues that the trial justice erred when he denied defendant's motion to pass the case after Harrell placed before the jury an "inherently inflammatory" suggestion that "served no proper prosecutorial function." The error, according to defendant, occurred after the state questioned Harrell about why he waited seven months to go to the police after he discovered that defendant was involved in the breaking and entering, to which Harrell replied:

"[The defendant] is like my brother, he's closer to me than my brothers actually, and I care about him a great deal, but something happened that—something

happened that involved my family, and I felt at that point that the lives of my children and my wife were in jeopardy, so I played the hand that was dealt me, so to speak, you know. I had no choice in the matter."

The defendant promptly moved to strike the comment and to pass the case, and the trial justice immediately instructed the jury to disregard Harrell's response.[23]

At a side-bar conference that immediately followed, defendant argued that Harrell's statement was "precisely the type of bad act material that is prejudicial to the maximum." After hearing further arguments, the trial justice reasoned that Harrell's statement did not specify why he went to the police, and he stated that "[i]t might very well be [that] the motivating factor of him going to the police was something that Mr. Coleman did, not [defendant]."

After a recess, the trial justice met with the parties in chambers. The defendant pressed his argument that Harrell's statement was "highly inflammatory," and that it "g[ave] the impression * * * [that] defendant ha[d] done something other than that with which he [was] charged in this case." The defendant further contended that there was "no way for [him] * * * to counter or to cure or to somehow mitigate the evidentiary effect of [Harrell's] remarks, notwithstanding the [c]ourt's cautionary instruction * * *." The trial justice asked defendant, based upon his suggestion that there had been multiple prejudicial remarks, to specifically identify the remarks to which he was referring. The defendant responded that he could not recall any specifically, but that it was "a general sense [he] was getting," ultimately stating that it was Harrell's "last remark" that provided "the basis for [his] motion [to pass the case]."

The trial justice denied defendant's motion to pass the case, stating that Harrell was "not particularly well educated," the state had questioned him appropriately, and he had given "a very lengthy, rambling and, in large part, nonresponsive response" to which "there was no objection * * * until his response was concluded." The trial justice explained that, although the reason for Harrell's disclosure to the police of this information at such a late date "might be relevant," the testimony was immediately struck and the jury was told to disregard the testimony, which the trial justice believed the jury understood clearly. Further, the trial justice stated that he did not believe the testimony was "going to influence the jury," but offered to provide further cautionary instructions if defendant desired, to which defendant responded that "the ruling of the [c]ourt striking [the testimony] and the curative instruction already provided [was] sufficient."

■■■■■ "A trial justice's ruling on a motion to pass is given great weight and will not be disturbed unless clear error is shown." *State v. Brown*, 9 A.3d 1232, 1238 (R.I.2010). "This is because the 'trial justice has a front-row seat at the trial and is in the best position to determine whether a defendant has been unfairly prejudiced.'" *Id.* (quoting *State v. Luciano*, 739 A.2d 222, 228 (R.I.1999)). "When ruling on a motion to pass, the trial justice must determine whether the evidence in question 'was of such a nature as to cause the jurors to become so inflamed that their attention was distracted from the issues submitted to them.'" *Id.* at 1239 (quoting *State v. Brown*, 619 A.2d 828, 831 (R.I. 1993)). "We previously have held that

---

**23.** The trial justice told the jury that it was to "completely disregard that last response," clarifying that it was "not evidence in the case, and it ha[d] nothing do with this case."

even prejudicial remarks do not necessarily require the granting of a motion to pass." *Id.*

In the case at hand, the trial justice provided a detailed account of why he was denying the defendant's motion to pass the case. After the trial justice determined that the statement at issue would not influence the jury, he asked the defendant whether he desired an additional "cautionary" jury instruction, which offer the defendant rejected. In our opinion, the trial justice did not commit clear error when he denied the defendant's motion to pass the case and, instead, relied on the jury's ability to follow his instructions to not consider Mr. Harrell's statement as evidence. *See State v. Patel,* 949 A.2d 401, 415 (R.I.2008) (stating that this Court presumes "that the jury is able to follow [cautionary] instructions in the absence of any evidence to the contrary"). This Court has stated that even "[i]f the evidence is so inflammatory, we will require a mistrial only if the 'cautionary instructions were untimely or ineffective.'" *State v. Lynch,* 19 A.3d 51, 61 (R.I.2011) (quoting *State v. Shinn,* 786 A.2d 1069, 1072 (R.I. 2002)). In the case at bar, the defendant has failed to show that Harrell's remark was so inflammatory and prejudicial that the jury would not be able to adequately decide the case based solely on the evidence before it, especially in light of the trial justice's timely instruction to "completely disregard" the testimony. Therefore, we conclude that the trial justice was not clearly wrong when he denied the motion to pass.

### III

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record of this case shall be remanded to the Superior Court.