December 17, 2020

**Supreme Court**

No. 2018-21-C.A.
(P2/12-216A)

State                    :

v.                       :

Nicholas Haffner.        :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email: opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

|  |  |
|---|---|
| State | : |
| v. | : |
| Nicholas Haffner. | : |

Present:  Suttell, C.J., Goldberg, Flaherty, and Robinson, JJ.

# O P I N I O N

**Justice Flaherty, for the Court.**  On March 27, 2017, a Providence County Superior Court jury found the defendant, Nicholas Haffner, guilty of assault with a dangerous weapon, to wit, a shod foot, and driving while intoxicated. He was thereafter sentenced to a term of five years at the Adult Correctional Institutions, with eighteen months to serve and forty-two months suspended, with probation.

On appeal, defendant contends that the trial justice erred when she instructed the jury about the concept of aiding and abetting.  He also argues that his so-called *Frye* hearing was conducted in error because the trial justice failed to include any discussion about aiding and abetting.  For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

# I

## Facts and Travel

On January 24, 2012, defendant was charged by criminal information with one count of assault with a dangerous weapon, a shod foot, and one count of driving while intoxicated (DUI). A jury trial commenced on January 26, 2017, but a mistrial was declared on January 31, 2017.

A second jury trial began on March 21, 2017. Before the trial started, and because a plea offer had been made to defendant (which would have resulted in a disposition not requiring incarceration), the trial justice held a hearing to address the concerns raised in *Missouri v. Frye*, 566 U.S. 134 (2012).[1] At the *Frye* hearing, the trial justice asked defendant if his lawyer had spoken with him about the elements of the charges that the state would have to prove beyond a reasonable doubt, and defendant responded, "Yes." The trial justice then specifically inquired about the charge of assault with a dangerous weapon as follows:

> "THE COURT: [D]id your lawyer talk to you about the definition of Assault With a Dangerous Weapon, what has to be proven?
>
> "THE DEFENDANT: Yes, your Honor.

---

[1] The purpose of a *Frye* hearing is for the court to inquire whether a plea offer has been made, what the specifics of the offer are, and whether the plea offer has been communicated to the client.

"THE COURT: And that a shod foot, when used in a certain manner, can indeed be considered a dangerous weapon?

"THE DEFENDANT: Yes, your Honor.

"THE COURT: And would you like me to tell you specifically what those elements are or are you satisfied that [your attorney] has gone over it with you?

"[DEFENDANT'S ATTORNEY]: Judge, I may add that we basically tried I would say approximately three quarters of this case before [a different trial justice]. Mr. Haffner stands before you this morning with the benefit of that experience, hearing the witnesses testify, for what it is worth.

"THE COURT: I'm aware of that. I want to make sure that whatever is done here doesn't come back and bite anybody.

"[DEFENDANT'S ATTORNEY]: Okay.

"THE COURT: In other words, I want to make sure he understands the elements of each of these counts and recommended amendments so that if he rejects the offer, because I will put it through as recommended, that he's making a knowing, voluntary and intelligent decision. You understand what I'm saying, sir?

"THE DEFENDANT: Yes, your Honor.

"THE COURT: Do you need any information before you determine whether to accept the offer?

"THE DEFENDANT: No, your Honor.

"THE COURT: Okay. Is it my understanding that you wish to reject the offer?

"THE DEFENDANT: Yes, your Honor."

After defendant rejected the state's offer, the trial began.

Vincent Gieck, Jr., the complaining witness, testified first. He said that at 11:30 p.m. on October 8, 2011, he had been at home with his girlfriend when he received a telephone call from a friend. In response to that call, he drove to the "sandpit," a location that he described as a clearing in the woods where young people frequently gathered for parties. He said that his then-girlfriend, Kayla Baumlin, accompanied him and that they arrived at the sandpit within ten to fifteen minutes after he received his friend's phone call.

He further testified that, when he arrived, he and Ms. Baumlin walked over to a fire at which approximately thirty people were gathered, some that he knew, and some that he did not know. He said that he saw his friend Nathan Rogler, who was bleeding from a wound to his head. Mr. Rogler told him that he had been hit in the head with a bottle, and, Mr. Gieck testified, he then became angry and asked, "Who threw the bottle? Where did it come from? What was it?" Mr. Gieck said that one individual responded by "[j]umping up and down, cussing and swearing and yelling [and] generally being aggressive." Mr. Gieck testified that the individual raised his hands up to his face and then "blows were exchanged" between he and that individual, with each man landing a few glancing punches on the other. He testified

that at that point, numerous other people joined in the fight and that he "was approached by several other people who were also swinging and grappling."

Mr. Gieck testified that he was confronted by three or four males, all of whom were approximately his age, and that he "was eventually knocked down, or taken down to the ground," at which point he covered his "head to try to less[e]n some of the impact." Mr. Gieck testified that, when the man who had first fought with him, who also had been knocked to the ground, regained his footing, he joined the other men in the attack. Mr. Gieck testified that at that point, the first man was directly in front of him, "throwing fists and kicking as well." He testified that the man's fists and feet were hitting his head and face and that the man's feet were shod in light-duty work boots.

Mr. Gieck testified that he was on the ground for two to three minutes and that, in that time, he was kicked approximately a dozen times. He testified that eventually a young woman lay on top of him to try to protect him from the punching and kicking, and finally he was able to get back on his feet. He said that he then made his way out of the sandpit and that he and Ms. Baumlin drove to his parents' home in Glocester, arriving there at approximately 3:30 or 4 a.m.

Mr. Gieck testified that his mother, who had been an army medic, dressed his wounds, and he went to sleep. He recounted that he went to the Burrillville police station the next morning around 10 a.m. and that he informed Officer Ryan Hughes

about what had occurred the night before.  Officer Hughes notified Mr. Gieck that there was a suspect in custody and he asked Mr. Gieck to view the suspect through a security monitor to see if he could identify the suspect as his assailant.  Mr. Gieck testified that he viewed the suspect and identified him "as the individual that was attacking [him] at the sandpit."

Mr. Gieck said that, after he finished his interview with the police, he went to Rhode Island Hospital to have his injuries treated.  Those injuries included cuts and lacerations around his head and elbows, a fractured front tooth, some minor bruising and bruised ribs, and bruises on his head, face, and back.  He made a courtroom identification of defendant as the man whom he had viewed on the monitor at the police station. Mr. Gieck also identified defendant as the person who had repeatedly kicked and punched him.

Nathan Rogler was the next witness to testify.  He testified that at around midnight on October 9, 2011, he was "off-roading" with a couple of friends near the power lines located between Burrillville and Glocester, when they came across a party. He described the party as a bonfire with music and approximately twenty-five to thirty people.  He said that words were exchanged about the different high schools that he, his friends, and the partygoers had attended, when approximately three people started pushing and shoving him.  He testified that he pushed somebody back and then that person smashed a bottle over his head.  He recounted that, after he was

hit with the bottle, other people began kicking and hitting him, but eventually he got away from the group. Mr. Rogler then said that he called Mr. Gieck and told him what had occurred and that he needed help.

He testified that Mr. Gieck told him on the telephone that he would come to the sandpit and that he arrived sometime later with his girlfriend, Ms. Baumlin. He testified that upon his arrival, Mr. Gieck asked Mr. Rogler who had hit him, and that soon a melee again broke out and punches were again thrown. He further testified that Mr. Gieck ended up on the ground, where he was punched and kicked by several people. Mr. Rogler said that he also ended up on the ground, but was nonetheless able to look up to see who was attacking Mr. Gieck. He described the assailants as three young white men, all approximately six feet tall. He added that eventually Mr. Gieck was able to scramble to his feet.

Mr. Rogler said that, after the fight, he and his friends drove to the home of Mr. Gieck's parents. He testified that the next day he went to the Burrillville police station and gave a statement to Officer Hughes. He also said that the police asked him to view a suspect who was in custody to see if he could identify him as one of the people who had been present the night before. Mr. Rogler testified that he recognized the suspect as one of those who had been hitting and kicking Mr. Gieck. He also made a courtroom identification of defendant as a person he had seen kicking Mr. Gieck.

Kathleen Wholey Rogler, another witness who attended the party, testified next and described a similar series of events. She testified that, on October 9, 2011, at around midnight, she was at the power lines in Burrillville off-roading with friends when she saw a fire surrounded by numerous people, so they stopped to see who might be there. She said that at first things were friendly, but about half an hour later, someone smashed a bottle over Mr. Rogler's head and that he was bleeding. She said that Mr. Rogler then called Mr. Gieck, who arrived about twenty minutes later.

She described that a big fight started soon after Mr. Gieck arrived and that both Mr. Rogler and Mr. Gieck ended up on the ground. She testified that she observed five or six white males hitting and kicking Mr. Gieck while he was on the ground, and that all the men kicking Mr. Gieck were wearing shoes. She also said that, before she and her friends left the scene, she noted vehicle license plates and then called both the Glocester and Burrillville police departments to notify them of the fracas. Additionally, Ms. Rogler recounted that, on the day after the incident, she identified defendant on a television monitor at the police station as one of the perpetrators from the night before. She also made a courtroom identification of defendant as one of the individuals she had seen kicking Mr. Gieck.

At a sidebar conference, the trial justice informed the attorneys that, based upon the testimony that had been offered, she would likely be providing an aiding and abetting instruction to the jury. Specifically, the trial justice remarked:

> "THE COURT: Come back. As long as we're here, have you read, I can't remember whether you had something on that case *State v Alberto Heredia* and *State v Manuel Texieira*. I was upheld in both of those cases and it was aiding and abetting, of course. * * * I mean I'm not saying, you know, it may be that your guy was at home with his parents that night. I don't know if you saw it—take a look at it. Maybe he wasn't there.
>
> "* * *
>
> "THE COURT: [W]hat would keep you from the one person that you found, if you have enough evidence to show that he was involved in that type of aiding and abetting enterprise, which is not a conspiracy, it is just a theory of recovery. * * * But you better take a look at that before your guy gets himself in a major jam because I very likely so far on this record would be charging aiding and abetting."

Ariane Fratantaro, the next witness to testify, said that on October 9, 2011, at around midnight, she was at a party with a bonfire with a group of friends at the power lines in Burrillville. At a certain point, she recounted, a fight broke out between former hockey players from the Burrillville and Ponaganset high schools and Mr. Rogler was hit in the head with a beer bottle. She said that some other men "jumped on top of" Mr. Rogler and then someone called Mr. Gieck.

Ms. Fratantaro testified that, when Mr. Gieck arrived with Ms. Baumlin, he tried to help Mr. Rogler but instead ended up on the ground with "about eight people or more on top of him and he was being kicked and punched." She testified that all of the people who were attacking Mr. Gieck were wearing shoes or boots.

She said that she went to the Burrillville police station the next morning and that, like the previous witnesses, she identified the person shown on a television monitor as one of the people who had kicked Mr. Gieck in the face the night before. However, Ms. Fratantaro was unable to make a courtroom identification of defendant.

Next, Sergeant William Lacey of the Burrillville Police Department testified that on the night in question he was working as a patrol officer, and, after receiving a call about an assault, he went to the power lines area and conducted an investigatory vehicle stop on a pickup truck. He identified defendant as the operator of that vehicle. He testified that he could see blood on defendant's clothing and that he smelled the odor of alcohol. He testified that Officer Hughes was called to the scene to perform a field sobriety test on defendant, and Officer Hughes arrived within ten minutes.

Officer Hughes, of the Burrillville Police Department, then testified. He said that, on that same date, at 3:40 a.m., he was called upon to assist another officer at a traffic stop. He testified that defendant was the operator of the stopped vehicle, that

defendant's eyes were bloodshot and watery, and that he could smell a strong odor of alcohol. He testified that defendant denied that he had been drinking or that he had been involved in an assault earlier that night. However, after he conducted a field sobriety test on defendant, Officer Hughes concluded that defendant was incapable of safely driving his vehicle and defendant was brought to the police station for processing.

Officer Hughes further testified that six individuals, including the victim in this case, Mr. Gieck, came to the station the next morning to report an assault. He testified that Mr. Gieck was able to identify defendant as one of the people who had kicked him. Officer Hughes further testified that Ms. Baumlin, Mr. Rogler, Ms. Rogler, and Ms. Fratantaro also identified defendant as one of the people who had kicked Mr. Gieck the night before.

The last witness to testify was Captain Michael McGrane of the Oakland/Mapleville Fire Department. Captain McGrane said that he transported defendant to the Landmark Medical Center for treatment for right hand pain on October 9, 2011. He testified that defendant had told him, "I hit someone earlier in the day." A notation in the records from Landmark Medical Center by an emergency-room nurse said that defendant had related that he "punched a guy in the head a lot of times[,]" and another notation that stated that defendant, "punched a person last night prior to swelling to right hand[.]"

After the parties rested, the trial justice instructed the jury. In so doing, she said, in pertinent part, that:

> "Now, there are two different ways the [s]tate can meet its burden of proof with respect to this charge. The first way the [s]tate can prove the defendant guilty of assault with a dangerous weapon is by proving that the defendant himself committed the physical act of assaulting Mr. Gieck.
>
> "The second way that the [s]tate can prove that the defendant committed the criminal offense of assault with a dangerous weapon against Mr. Gieck is by proving that he aided and abetted another in committing the criminal offense of assault on Mr. Gieck with a dangerous weapon (a shod foot), a foot with a shoe on it, okay, that is the situation, even if he did not personally kick Mr. Gieck with his own shod foot.
>
> "For you to determine whether the [s]tate has met its burden of proof, you will need to understand what certain terms mean when used in the legal sense."

She further instructed that:

> "If the state either proves that defendant committed the offense as the 'principal actor' or committed the offense under the legal theory of 'aiding and abetting,' then you must find the defendant 'guilty' as to the charge in Count 1. However, if the [s]tate fails to prove beyond a reasonable doubt that defendant committed the offense either as 'principal actor' or under the theory of 'aiding and abetting,' then you must find the defendant 'not guilty' as to the charge in Count l."

- 12 -

She proceeded to give further instructions as to what it meant for defendant to have committed the offense in question as the principal actor and what it meant for defendant to have aided and abetted in the commission of the offense.

After the jury charge was delivered, defendant objected to the aiding-and-abetting instruction.[2] The trial justice overruled defendant's objection.

---

[2] Specifically, defendant made the following objection:

> "Your Honor, as the [c]ourt I'm sure anticipates, because of communications we've had previously, I'm objecting to the fact that the [c]ourt gave a so-called 'aiding and abetting instruction' on the charge of Assault With a Dangerous Weapon. First of all, Judge, I don't see, respectfully, any evidence whatsoever of aiding and abetting. It's noteworthy that aiding and abetting is not a lesser included offense within the crime of assault with a dangerous weapon. Aiding and abetting, as the [c]ourt noted in its instructions to the jury, generally refers to one who assists, aids, counsels, orders, procures, et cetera, et cetera. In this case, if the jury accepts the fact that Mr. Haffner was in fact or is in fact guilty beyond a reasonable doubt, it can only do so as a 'principal.' All of the evidence seems to suggest that he in fact is a principal in this case. I recognize from some research that it doesn't matter that his confederates, if you will, the other people who kicked Mr. Gieck, punched him, et cetera, are not named or identified from the [s]tate's witnesses. But I'm concerned that this aiding and [a]betting instruction will confuse the jury. Respectfully, it is not an appropriate charge to give this jury especially because the only evidence is that he was as a principal. It is a one count Information, Assault With a Dangerous Weapon, to wit, a shod foot. I didn't hear a single witness say, for example, Mr. Haffner held Mr. Gieck down, or that he was otherwise egging on anybody else to kick him. So for

After deliberating, the jury returned guilty verdicts on both counts of the information.[3]  On the charge of assault with a dangerous weapon, defendant was sentenced to five years, with eighteen months to serve and the remainder of the sentence suspended, with probation; and on the DUI charge, he was given a one-year sentence, the entirety of which was suspended, with probation, to run concurrently with the first sentence.[4]

## II

### Discussion

On appeal, defendant makes two arguments.  The first is that the trial justice erred in charging the jury that it could convict defendant as either a principal or as an aider and abettor.  He maintains that the evidence supported a finding of criminal liability only as a principal.  Second, defendant argues that the trial justice erred during the *Frye* hearing because she failed to put him on notice that he was exposed to criminal liability for aiding and abetting.

those reasons, and because a person cannot be both a principal and an aider and abettor, I do object to that instruction."

[3] The defendant moved for a new trial, but the motion was denied.
[4] The defendant does not press an appeal with respect to his conviction for DUI.

- 14 -

# A

## Aiding and Abetting

As noted above, defendant first maintains that the jury instruction on aiding and abetting was given in error because there was no evidence that defendant had assisted another person in kicking the victim with a shod foot. The defendant also claims that the substance of the aiding-and-abetting instruction that the trial justice gave was erroneous in two respects. The defendant argues both that, in contravention of the holding of the United States Supreme Court in *Rosemond v. United States*, 572 U.S. 65 (2014), the instruction failed to advise the jury that defendant would have had to have acted before the felony assault took place in order to assist another in the commission of the act of felony assault, and that the trial justice failed to remind the jury that an accidental or unintentional kicking of the victim, by a person other than defendant, would not constitute a felony assault.

"It is well established that we review challenged jury instructions in a *de novo* manner." *State v. Delestre*, 35 A.3d 886, 891 (R.I. 2012). "In conducting that review, 'it is our role to *examine the instructions in their entirety* to ascertain the manner in which a jury of ordinary intelligent lay people would have understood them[.]'" *Id.* (quoting *State v. John*, 881 A.2d 920, 929 (R.I. 2005)). It is well-settled that "this Court will not examine a single sentence apart from the rest of the instructions, but rather the challenged portions must be examined in the context in

- 15 -

which they were rendered." *Id.* (quoting *State v. Kittell*, 847 A.2d 845, 849 (R.I. 2004)).

"In a case such as this, when we review a trial justice's challenged jury instructions, we will uphold them when they 'adequately cover the law.'" *Delestre*, 35 A.3d at 891 (quoting *State v. Ensey*, 881 A.2d 81, 95 (R.I. 2005)). "However, 'even if we conclude that a jury instruction was erroneous, reversal is warranted only if a jury could have been misled to the prejudice of the complaining party.'" *Id.* (quoting *State v. Adefusika*, 989 A.2d 467, 475 (R.I. 2010)); *see State v. Ventre*, 910 A.2d 190, 197 (R.I. 2006) ("If we are persuaded that the jury could have been misled by an erroneous charge to the resultant prejudice of the complaining party, reversal is warranted.").

The state bears the burden of proving "every element necessary to constitute the crime charged beyond a reasonable doubt." *State v. Hazard*, 745 A.2d 748, 751 (R.I. 2000). "A jury instruction relieving the state of this burden violates a defendant's due process rights." *Id.* General Laws 1956 § 11-1-3 provides that a person who aids or abets "another to commit any crime or offense, shall be proceeded against as principal * * * and upon conviction shall suffer the like punishment as the principal offender is subject to by this title." The law is well-settled "that one who aids and abets in the commission of the crime and is also

present at the scene may be charged and convicted as a principal." *State v. McMaugh*, 512 A.2d 824, 831 (R.I. 1986).

In this case, defendant objected at trial to the delivery of the aiding-and-abetting instruction by the trial justice. In *State v. Davis*, 877 A.2d 642 (R.I. 2005), we recognized that a "defendant's manner of participation, whether as a principal or [as] an aider or abettor, is not an element of the crime." *Davis*, 877 A.2d at 648. Accordingly, pursuant to the holding in *Davis*, the prosecution is not required to persuade a unanimous jury beyond a reasonable doubt with respect to the manner in which a defendant participated in a crime. *See id.* Our holding in that case was based on the pertinent statutory language of § 11-1-3, which "eliminates the legal distinction between [1] the commission of a crime as a principal and [2] aiding and abetting another in the commission of a crime[.]" *Id.*; *see* 23A C.J.S. *Criminal Law* § 1883 at 508 (2006) (noting that "a jury need not unanimously find that a defendant acted either as a * * * perpetrator or an aider and abettor [because the] * * * statute governing * * * aider and abettor liability merely establishes a separate basis of liability, but not a separate crime or element of the underlying crime").

We note that, at trial, defendant had objected only to the rendering of an aiding-and-abetting instruction, but he offered no challenge to the substance of the instruction. Because he did not assert any objection to the substance of the charge at trial, he has waived any challenge to the actual content of the instruction. It is

well-settled that, when a defendant fails to object to a jury instruction in the Superior Court, he or she waives the right to appeal the verdict based on that instruction. *See* Super. R. Crim. P. 30; *State v. Flori*, 963 A.2d 932, 937 (R.I. 2009). "Rule 30 of the Superior Court Rules of Criminal Procedure is crystal clear * * * that '[n]o party may assign as error any portion of the charge or omission therefrom unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the party's objection.'" *State v. Andrade*, 209 A.3d 1185, 1198 (R.I. 2019) (quoting Super. R. Crim. P. 30).[5]

Thus, we turn our attention to whether the evidence justified an instruction on aiding and abetting. As noted *supra* and explained in *Davis*, aiding and abetting is not a separate element of a charge of which a defendant must be aware in advance and which must be separately proven by the state beyond a reasonable doubt. *See Davis*, 877 A.2d at 648. Rather, it is a theory of the manner in which a crime was committed. *Id.* In this case, we conclude that such an instruction was indeed

---

[5] However, we pause to note that we discern no error in the substance of the jury instruction. The defendant places much reliance on *Rosemond v. United States*, 572 U.S. 65 (2014) where the defendant in that case was charged with and convicted of violating 18 U.S.C. § 924(c), which prohibits using or carrying a firearm "during and in relation to any crime of violence or drug trafficking crime[,]" as well as aiding and abetting that offense under 18 U.S.C. § 2. *Rosemond*, 572 U.S. at 68. However, in *Whitaker v. State*, 199 A.3d 1021 (R.I. 2019), we held that "*Rosemond* plows no new constitutional ground and applies only to 18 U.S.C. § 924(c) and the federal aiding-and-abetting statute. It has no impact on state law." *Whitaker*, 199 A.3d at 1029. Therefore, defendant's reliance on such caselaw is misplaced.

appropriate. Several witnesses described a chaotic scene in which defendant was one of several individuals who were simultaneously attacking Mr. Gieck, thus making it difficult to determine which specific attacker delivered which specific blows to Mr. Gieck's body and face. The testimony made it clear that defendant was a participant in "a community of unlawful purpose at the time the act was committed." *Whitaker v. State*, 199 A.3d 1021, 1029 (R.I. 2019) (brackets omitted) (quoting *Delestre*, 35 A.3d at 895). Significantly, we have held that aiding-and-abetting instructions were appropriate based on facts similar to those in this case. *See State v. Whitaker*, 79 A.3d 795, 807 (R.I. 2013) (trial justice properly instructed the jury on aiding and abetting based on testimony that the defendant arrived at the apartment armed, that he expressed interest in taking the chain from an individual at the party, that the co-defendant took the chain in question, and that the defendant drew a gun and aimed it at a group of people during struggle); *DeCiantis v. State*, 599 A.2d 734, 735 (R.I. 1991) (aiding-and-abetting instruction proper based on evidence of the defendant's presence at the scene of a murder in which others had participated). As such, we conclude that the trial justice did not err in imparting such an instruction to the jury.

# B

## *Frye* **Hearing**

The defendant next argues that the trial justice erred when she conducted the *Frye* hearing because defendant was not placed on notice that he was exposed to criminal liability for aiding and abetting. He asserts that, because the *Frye* hearing lacked such a dialogue, he could not have made a voluntary, knowing, and intelligent decision to reject the state's plea offer at that time. Before we can consider the merits of defendant's arguments, however, we first must address whether this issue is properly before this Court.

As we have said on innumerable occasions, "a litigant cannot raise an objection or advance a new theory on appeal if it was not raised before the trial court." *State v. Bido*, 941 A.2d 822, 829 (R.I. 2008). This directive "will not be disturbed unless 'basic constitutional rights are concerned.'" *State v. Gomez*, 848 A.2d 221, 237 (R.I. 2004) (quoting *State v. Donato*, 592 A.2d 140, 141 (R.I. 1991)). In those cases, "the alleged error must be more than harmless, and the exception must implicate an issue of constitutional dimension derived from a novel rule of law that could not reasonably have been known to counsel at the time of trial." *State v. Breen*, 767 A.2d 50, 57 (R.I. 2001). After a careful review of the record, we conclude that defendant did not articulate an objection, nor did he request that the

trial justice conduct a second *Frye* hearing after she alerted the parties that, after listening to evidence, she was inclined to instruct on aiding and abetting.

Additionally, the exception to the raise-or-waive rule is of no assistance to defendant. A *Frye* hearing is not "an issue of constitutional dimension derived from a novel rule of law that could not reasonably have been known to counsel at the time of trial." *Breen*, 767 A.2d at 57.

We add that, even if the defendant had raised the issue of a second *Frye* hearing in the trial court, our review of the record fails to reveal any error. There is no dispute that the state made a plea offer to the defendant, that a hearing was held during which the trial justice made the defendant aware of the offer and was satisfied that he understood the elements of the crimes of which he was charged, and that the defendant chose to reject the state's offer.[6] As we have explained *supra*, aiding and abetting is not an additional element of the crime of assault with a dangerous weapon, such that the defendant needed to understand its nature in order to properly

---

[6] The defendant's reliance on *Lafler v. Cooper*, 566 U.S. 156 (2012), is also misplaced. *Lafler* involved a collateral attack on a conviction claiming ineffective assistance of counsel, not a direct appeal, as is the case here.

consider the state's offer.[7]  Therefore, the trial justice did not err in the manner in

which she proceeded during the *Frye* hearing.[8]

## III

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of conviction.

The record shall be remanded to the Superior Court.

---

[7] At oral argument, the defendant's counsel conceded that there is no caselaw to support a contention that a trial justice has a duty to conduct a second *Frye* hearing after sufficient evidence has been presented to instruct the jury on another theory of liability.

[8] Furthermore, as noted by the defendant's counsel in the midst of the *Frye* hearing, the defendant had proceeded through "approximately three quarters of this case before [a different trial justice]" and therefore stood before the court at that juncture "with the benefit of that experience, hearing the witnesses testify, for what it is worth."



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE

Licht Judicial Complex
250 Benefit Street
Providence, RI 02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Nicholas Haffner. |
| **Case Number** | SU-2018-0021-CA (P2/12-216A) |
| **Date Opinion Filed** | December 17, 2020 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, and Robinson, JJ. |
| **Written By** | Associate Justice Francis X. Flaherty |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Netti C. Vogel |
| **Attorney(s) on Appeal** | For State: <br><br> Christopher R. Bush <br> Department of Attorney General <br> For Defendant: <br><br> Edward C. Roy, Jr., Esq. |